**C. M. ROCCA Sr., et al.**

v.

**The UNITED STATES.**

**No. 27–70.**

United States Court of Claims.

July 19, 1974.

James E. Cox, Martinez, Cal., attorney of record for plaintiffs, C. M. Rocca, Sr., J. Diane Rocca, C. M. Rocca, Jr., and Rosemary Rocca.

Richard C. Cahoon, Salt Lake City, Utah, attorney of record for Verda M. (Forester) Williams and A. E. Miller, Trustee in Bankruptcy for the Estates of G. F. Forester, C. M. Rocca, Jr., and Rosemary Rocca, third-party plaintiffs.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for defendant; Joseph J. Leahy, III, Washington, D. C., of counsel.

Angelo A. Iadarola, Washington, D. C., attorney for amicus curiae, Georgia-Pacific Corp.; Wilkinson, Cragun & Barker and Philip A. Nacke, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and SKELTON and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on the parties' exceptions to the recommended decision filed October 31, 1973, by Trial Judge Lloyd Fletcher, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the recommended decision, with modifica-

tions by the court, as hereinafter set forth, it hereby affirms and adopts the same, as modified, as the basis for its judgment in this case. Therefore, judgment is entered for the plaintiffs as set forth in the conclusion of law which follows the findings of fact, except for litigation expenses which are denied.

## Opinion of Trial Judge

FLETCHER, Trial Judge: As Mr. Justice Rehnquist recently observed in another connection, this case "might be said to abound in parties." Grubbs v. General Electric Credit Corp., 405 U.S. 699, 704, 92 S.Ct. 1344, 1348, 31 L.Ed.2d 612 (1972). Descriptive of this is the following summary. Some of the plaintiffs filed their petitions under the Redwood National Park Act, Pub.L. 90–545, approved October 2, 1968, 82 Stat. 931. They alleged that on October 2, 1968, they owned land described in Exhibit A thereto, which was the same as parcels numbered 03–137, 03–139, and 03–141. Plaintiffs also alleged that they held beneficial interest in various deeds of trust covering lands described in Exhibit B to the petition which described parcels 03–138, 03–140, 03–142, and 03–143.

Because of the fact that plaintiffs alleged to own a beneficial interest in parcels No. 03–138, 03–140, 03–142, and 03–143, defendant moved to join additional parties plaintiff to appear and assert their interests, if any, in the last numbered parcels. Some of the record owners of those parcels appeared and asserted their claims.

The record owner of parcels 03–138 and 03–140 appeared to be Lane W. Crossley, et ux. Mrs. Crossley filed a claim on April 19, 1971, alleging that her husband died on or about October 15, 1970, and stated that she was the surviving tenant. Mrs. Crossley claimed the right to recover compensation for parcels 03–138 and 03–140.

The record owner of parcel 03–142 appeared to be G. S. Forester and Verda M. Forester, his wife. G. F. Forester filed his petition on July 12, 1971, al-

leging that on October 2, 1968, he was the owner of an undivided one-half interest in the property described. Also, on July 12, 1971, Verda M. Forester Williams filed her petition alleging that on April 9, 1970, a final judgment of dissolution of the marriage of Verda M. Forester and G. F. Forester was entered by the Superior Court of California, County of Shasta, and that the judgment provided for the property described to be held by the parties as tenants in common, and a trustee was appointed to manage the property. Verda Forester Williams alleged that she was the owner of a one-half interest in parcel 03–142 and had an interest in one-eighth of the proceeds in excess of $1,000,000 received by C. M. Rocca, Sr. and C. M. Rocca, Jr. in the property described in the Rocca petition.

The record owner of parcel 03–143 appeared to be Paul L. Muth and Genevieve Muth, his wife. Both parties were served with notice but neither Paul L. Muth nor Genevieve Muth filed a petition in this court.

In addition to the record title holders, there were also certain mortgagees or trust deed holders whose interests related to all of the lands involved. The Federal Land Bank of Berkeley, California, held a trust deed as a lien against all of the lands involved and also Lawrence Crivelli and his wife Hazel Crivelli held a lien against all of the lands involved. There were also holders of power line easements and tax liens. These parties were notified that the case was pending and either forced to appear or stipulated as to their interest. A cross claim was filed by defendant with relation to a Federal tax lien against the Rocca interest.

At the time of a pretrial conference held in San Francisco, on March 20, 1972, it appeared that A. E. Miller was acting not only as receiver for the property of G. F. Forester and Verda Forester Williams, but also as trustee in bankruptcy for G. F. Forester and C. M. Rocca, Jr. and Rosemary Rocca, his wife. It also appeared that C. M. Rocca, Sr. and J.

Diane Rocca were divorced subsequent to October 2, 1968.

At the time of trial a stipulation of settlement was filed relating to the interest of Yvonne C. Crossley out of which payment was made for the interest of Eugene Luhr & Co., plaintiff in case No. 297–70 which was consolidated with this case. Payment was also provided to discharge the lien interest held by Bank of America National Trust & Savings Association as assignee of C. M. Rocca, Sr., and C. M. Rocca, Jr., and the remainder was paid to Yvonne C. Crossley. Stipulations were also entered into with the Federal Land Bank of Berkeley, and Lawrence Crivelli and Hazel Crivelli, his wife, to discharge the liens held by those parties.

During the trial it appeared that on September 14, 1971, Paul L. Muth and Genevieve Muth executed a deed to the land described as parcel 03–143 to G. F. Forester and Verda M. Williams, as joint tenants. In a letter addressed to Verda Forester Williams, Paul Muth stated that even though a deed to the land was issued in his name, he had not paid for the land and since the property was involved in this litigation, he had deeded it back to the former owners. In view of the fact that no consideration had been paid for the land, defendant was willing to consider the deed back to the former owners as a transfer of title in the nature of a resulting trust by operation of law which would be an exception to the nonassignment statute. In the final analysis, it was considered that the Muths were fully aware of the situation and their rights and they refused to participate and were thus foreclosed from further payment for any interest in parcel 03–143.

### The Issue of Valuation

Except for an issue relating to reimbursement of attorneys' fees and other litigation expenses, discussed below, the only issue in dispute herein is the value of the property described as parcels 03–137, 03–139, and 03–141, formerly owned by C. M. Rocca, Sr., et ux., and C. M. Rocca, Jr., et ux. (subject to certain liens), and also, the value of parcels 03–142 and 03–143, formerly owned by G. F. Forester and Verda Forester Williams subject to an outstanding deed of trust. A plethora of expert witnesses testified on behalf of each party to this litigation and the testimony of these numerous witnesses is set forth with particularity in the findings of fact below. In order to prevent undue repetition, the testimony and conclusions of these many expert witnesses will not be repeated in this opinion. This is because I have singled out from all the expert testimony the evidence presented by one expert whose testimony was found to be based upon very meticulous, painstaking, and, in my view, thoroughly reliable testimony.

It will be recalled that there is no issue in this case regarding the Government's liability, a point which defendant concedes under the Act as provided in § 3(b)(2), 16 U.S.C. § 79c(b)(2), stating that:

> The United States will pay just compensation to the owner of any real property taken by paragraph (1). * * * Any action against the United States for the recovery of just compensation for the land and interests therein taken by the United States by this subsection shall be brought in the Court of Claims.

The latest word by the United States Supreme Court on the determination of just compensation or fair market value, is United States v. Fuller, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973). The Court had the following to say at p. 490, 93 S.Ct. at p. 803, 35 L.Ed.2d 16:

> Our prior decisions have variously defined the term "just compensation" which the Fifth Amendment requires to be made when the Government exercises its power of eminent domain. The owner is entitled to fair market value, United States v. Miller, 317 U.S. 369, 374 [63 S.Ct. 276, 87 L.Ed. 336] (1943), but that term is "not an absolute standard nor an exclusive method of valuation." United States v. Vir-

ginia Electric & Power Co., 365 U.S. 624, 633 [81 S.Ct. 784, 790, 5 L.Ed. 2d 838] (1961). The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness, United States v. Commodities Trading Corp., 339 U.S. 121, 124 [70 S.Ct. 547, 549, 94 L.Ed. 707] (1950), as it does from technical concepts of property law.

■ Starting from these general principles, I now proceed to a consideration of what I regard to be the best expert analysis of the proper valuation contained in this record. The most impressive expert, in my judgment, was H. Rich Bramwell, whose testimony and extensive preparation were obvious throughout those portions of the record in which Bramwell's testimony may be found. In Bramwell's view, the highest and best use of the Rocca property as of October 2, 1968, was as an investment for further gain. In his testimony, he took into account reasonably nearby properties which he considered to be more or less comparable to the subject property. As a result of his studies which, as pointed out were extensive, he had arrived at the conclusion that the Rocca parcels as a unit had a fair market value on October 2, 1968, of $475,000 which is roughly $1,432 per acre. I consider this a fair estimate by a knowledgeable and impressive witness and accept the same for purposes of this case.

As previously pointed out, no effort will be made at this point to analyze the testimony of the other expert witnesses since their views are summarized in the findings of fact below and a repetition thereof would merely serve to lengthen an already long opinion.

With respect to the Forester-Williams parcels, much the same considerations are applicable except that in the case of Forester-Williams, the land involved is considerably steeper, more subject to erosion and sliding and, therefore, an adjustment downward should be made

to compensate for this difference. In my judgment, the record supports a valuation of $1,000 an acre for these parcels for a total of approximately $57,570 for the entire tract as a unit.

### The Issue of Litigation Expenses

Plaintiffs claim entitlement to reimbursement for their litigation expenses including reasonable attorney, appraisal, and engineering fees actually incurred because of this proceeding. Defendant denies this contention relying on such cases as Dohany v. Rogers, 281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904 (1930) where the Supreme Court held, *inter alia*, at p. 368, at p..302 og 50 S.Ct.;

> Attorneys' fees and expenses are not embraced within just compensation for land taken by eminent domain.

However, without denying the existence of this well-established rule in the past, plaintiffs respond that it has been changed by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, P.L. 91–646, 91st Cong., approved January 2, 1971, 42 U.S.C.A. § 4651 et seq.

That Act provides in pertinent part as follows:

> § 4654. Litigation expenses
>
> (a) The Federal court having jurisdiction of a proceeding instituted by a Federal agency to acquire real property by condemnation shall award the owner of any right, or title to, or interest in, such real property such sum as will in the opinion of the court reimburse such owner for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of the condemnation proceedings, if—
>
> (1) the final judgment is that the Federal agency cannot acquire the real property by condemnation; or
>
> (2) the proceeding is abandoned by the United States.
>
> (b) Any award made pursuant to subsection (a) of this section shall be

paid by the head of the Federal agency for whose benefit the condemnation proceedings was instituted.

(c) The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding. Pub.L. 91–646, Title III, § 304, Jan. 2, 1971, 84 Stat. 1906.

House Report No. 91–1656, 91st Cong., 2d Sess., U.S.Code Cong. & Admin.News 1970, pp. 5850, 5874 explains the purpose of § 304 of the Act (42 U.S.C.A. § 4654(c), *supra*) in the following words:

Section 304 would authorize the reimbursement of owner of any right, or title to, or interest in real property for reasonable expenses of litigation, including legal, appraisal and engineering fees, actually incurred because of the taking of real property by Federal agencies, where (1) the court determines that a condemnation was unauthorized, (2) the Government abandons a condemnation, or (3) *a property owner brings an action in the nature of inverse condemnation* and obtains an award of compensation. (Tucker Act)

Ordinarily the Government should not be required to pay expenses incurred by property owners in connection with condemnation proceedings. The invitation to increased litigation is evident. [Emphasis supplied.]

The Act is of no help to plaintiffs. What they overlook is that, before there can be reimbursement for litigation expenses, the taking of their property must

have been done "by a Federal agency" which is defined in the aforesaid Uniform Relocation Assistance Act as "any department, agency, or instrumentality *in the executive branch of the Government* * * *." [Emphasis supplied.] 42 U.S.C.A. § 4601.

■ Here, by contrast, in the Redwood National Park Act, the taking was by an act of Congress itself whereby Congress declared that, effective on October 2, 1968, the United States was immediately vested with all right, title, and interest in all real property within the designated park boundaries, including plaintiffs' lands. This action constituted what Judge Nichols has aptly described as a "pure legislative taking." Drakes Bay Land Co. v. United States, 424 F.2d 574, 584, 191 Ct.Cl. 389, 408 (1970).

■ Furthermore, as shown by the provisions of the Act and by the above House Report, before litigation expenses can be paid, it must be shown that (1) the final judgment is that the Federal agency cannot acquire the real property by condemnation (*e. g.*, where the court determines that the condemnation was unauthorized); or (2) the proceeding is abandoned by the United States; or (3) the property owner has brought an action in the nature of inverse condemnation and obtains an award of compensation. None of these situations existed in the instant case. The taking of the title to the property by the Government in this case was by an Act of Congress, which was equivalent to and the same as a taking by condemnation. It is well established that litigation expenses cannot be recovered by a property owner in a condemnation case.

The plaintiffs point to the case of Drakes Bay Land Co. v. United States, 459 F.2d 504, 198 Ct.Cl. 506 (1972), as authority for their recovery of their litigation expenses under the Uniform Relocation Assistance Act. It is true that we allowed the property owner in that case to recover such expenses where his property was taken by an Act of Con-

gress. However, that case was vastly different from the instant case and is clearly distinguishable. In that case, the Congress did not take title to the land when it passed the Act creating the Point Reyes National Seashore (Pub.L. 87–657, 16 U.S.C. § 459c–1 (1964), 76 Stat. 538), which included the land of the plaintiff. After the passege of that Act, the plaintiff incurred expenses in connection with a long series of difficulties with the Government, including opposition to development and subdivision platting of the property and purchase and closing by the Government of the only practical access road to the land. Finally, the plaintiff was forced to bring an inverse condemnation suit in which the Government denied liability. This court held the Government liable for just compensation for the taking of the property and remanded the case to the trial judge to determine the amount of compensation due. *See* Drakes Bay Land Co. v. United States, 424 F.2d 574, 191 Ct.Cl. 389 (1970). Thereafter, another trial was held on quantum (See 459 F.2d 504, 198 Ct.Cl. 506, *supra*), requiring more expense to the plaintiff.

In the instant case, the Government took plaintiffs' land by the Act and admitted liability at that time for just compensation. The plaintiffs did not have to file an inverse condemnation suit to establish liability, as was the case in the *Drakes Bay* lawsuit. The amount of compensation due to the plaintiffs here was determined in the same manner that compensation is determined in any other compensation case.

We conclude that plaintiffs cannot bring themselves within the provisions of § 304 of the Uniform Relocation Assistance Act above set forth, and consequently the *Dohany* rule prohibits their attempted recovery of litigation expenses.

## FINDINGS OF FACT

1. This claim is before the court pursuant to the provisions of 28 U.S.C. § 1491, and as authorized in 16 U.S.C. § 79c (1970), Pub.L. 90–545, approved October 2, 1968; 82 Stat. 931.

2. Public Law 90–545 established a Redwood National Park in the State of California. Section 3 of Public Law 90–545 provides, in pertinent part:

\* \* \* \* \* \*

(b) (1) Effective on the date of enactment of this Act, there is hereby vested in the United States all right, title, and interest in, and the right to immediate possession of, all real property within the park boundaries designated in maps NPS–RED–7114–A and NPS–RED–7114–B, except real property owned by the State of California or a political subdivision thereof and except as provided in paragraph (3) of this subsection. \* \* \*

(2) The United States will pay just compensation to the owner of any real property taken by paragraph (1) of this subsection. Such compensation shall be paid either: (A) by the Secretary of the Treasury from money appropriated from the Land and Water Conservation Fund, including money appropriated to the Fund pursuant to section 4(b) of the Land and Water Conservation Fund Act of 1965, as amended, subject to the appropriation limitation in section 10 of this Act, upon certification to him by the Secretary of the agreed negotiated value of such property, or the valuation of the property awarded by judgment, including interest at the rate of 6 per centum per annum from the date of taking the property to the date of payment therefor; or (B) by the Secretary, if the owner of the land concurs, with any federally owned property available to him for purposes of exchange pursuant to the provisions of section 5 of this Act; or (C) by the Secretary using any combination of such money or federally owned property. Any action against the United States for the recovery of just compensation for the land and interests therein taken by the United States by this subsection shall be brought in the Court of Claims as provided in title 28, United States Code, section 1491.

3. The bill to establish a Redwood National Park initially passed the Senate on November 1, 1967. The bill passed by the Senate included the property upon which this claim is based. Hearings to discuss the proposed park were held by the Subcommittee on National Parks and Recreation of the Committee on Interior and Insular Affairs, House of Representatives, in Crescent City, California, on April 16, 1968, and in Eureka, California, on April 18, 1968. The House of Representatives passed a bill on July 15, 1968, which, although differing from the Senate bill on the matter of total acreage, included the property on which this claim is based. To resolve the acreage discrepancy and other matters, a conference was held which resulted in a conference report accepted by the House on September 11, 1968, and by the Senate on September 12, 1968. The acreage designated by the conference report included the property on which this claim is based. The bill was signed by the President and became law on October 2, 1968.

4. Prior to June 1968, Lawrence and Hazel M. Crivelli had owned a ranch consisting of 533 acres of which the property involved in this litigation is a part. The ranch was held by them subject to a mortgage to the Federal Land Bank of Berkeley. The Bank was notified of the pendency of this suit. It presented its claim, and the mortgage balance, plus accumulated interest thereon, has now been paid by defendant pursuant to partial judgment entered herein.

5. The Crivelli ranch had been available on the market for sale for a number of years due apparently to the adverse effect on the property of a damaging flood on the Klamath River. The Crivelli Property had been listed for sale by the Bob White Realty Co. in Klamath, California and by Hornsby and White in Eureka, California. During the fall of 1964, Ted Brown, a broker in Eureka, California, had a written listing of $300,000 on the property and Hornsby and White had two possible sales of the property which were never consummated.

6. On June 1, 1968, only four months prior to the taking by defendant, a sale of the Crivelli ranch to one Bill Cotton was concluded for $265,000, or approximately $500 per acre. Cotton paid the consideration recited in the following manner: (1) He gave Crivelli a deed of trust note for $210,257.20; (2) Cotton assumed the first mortgage on the property of approximately $18,000 due to the Federal Land Bank of Berkeley; (3) Cotton gave a personal note for $21,000 to the realtor who handled the sale to pay the real estate commission owed by Crivelli; and (4) Cotton made a cash payment of not in excess of $16,000. Negotiation and agreement on the terms of sale were reached at an earlier period but the final closing of the sale was delayed. Cotton gave Crivelli a $50,000 unsecured note as consideration for permitting Cotton's option to purchase to remain open for approximately 10 months. Lawrence and Hazel Crivelli were notified of the pendency of this case. They filed their claim, and their aforesaid deed of trust note, plus accumulated interest has been paid in full by defendant pursuant to partial judgment entered herein.

7. On August 14, 1968, Cotton undertook to trade the Crivelli ranch to C. M. Rocca, Sr., and C. M. Rocca, Jr., in exchange for Viewpoint Ranch in Oregon. Under Oregon law the Roccas never actually transferred the title of the Viewpoint Ranch to Cotton. There was a mortgage thereon in favor of Connecticut General Life Insurance Company which was later foreclosed.

8. On September 25, 1968, the Roccas conveyed two separate parcels of the Crivelli ranch to Lane W. and Yvonne C. Crossley, as tenants by the entirety, taking a note and deed of trust for $134,000 plus other consideration. One parcel is identified as No. 03–138 and the other is No. 03–140. Parcel 03–138 consists of 114 acres and parcel 03–140 consists of 12 acres. The Crossleys were notified of the pendency of this action and Mrs. Crossley filed her claim, alleging that Lane W. Crossley had died and she was

the surviving tenant. The Crossley interest was settled by stipulation and partial judgment, and the note and mortgage discharged.

9. On October 2, 1968, the remaining part of the Crivelli ranch, which is the subject of the action, was divided into five parcels but held in two ownerships.

(a) The first ownership relates to parcels 03–137, 03–139, and 03–141 held in the names of C. M. Rocca, Sr., J. Diane Rocca, his wife; C. M. Rocca, Jr., and Rosemary Rocca, his wife. This ownership will hereafter be referred to as Rocca. C. M. Rocca, Jr. and his wife, Rosemary Rocca, have filed a voluntary petition in bankruptcy. C. M. Rocca, Sr. and J. Diane Rocca were divorced subsequent to October 2, 1968. Title to the land was subject to the following encumbrances: (1) the deed of trust due the Federal Land Bank of Berkeley, (2) the note and deed of trust due Lawrence and Hazel M. Crivelli, and (3) a lien for taxes due the United States.

(b) The second ownership relates to parcels 03–142 and 03–143. Record title to parcel 03–142 consisting of approximately 57.5 acres, was in the name of G. F. Forester and Verda M. Forester, his wife, on October 2, 1968, having been conveyed to them by Rocca on September 20, 1968, in lieu of Forester's commission for arranging the property exchange referred to in finding 7, *supra*.

Record title to parcel 03–143 was in the name of Paul L. Muth and Genevieve Muth, his wife, on October 2, 1968. Title to both parcels was subject to the deeds of trust in favor of the Federal Bank of Berkeley, and Lawrence and Hazel Crivelli mentioned above, and also to a deed of trust executed by G. F. Forester and Verda M. Forester in the sum of $30,000 in favor of C. M. Rocca, Sr., and C. M. Rocca, Jr.

(c) G. F. Forester and Verda M. Forester were notified of the pendency of this action. Verda M. Forester Williams responded by correcting her name and notifying the court that a final judgment of dissolution of the marriage of Verda M. Forester and G. F. Forester was entered by the Superior Court of California, County of Shasta, on April 9, 1970, and that the judgment provided for the property described to be held by the parties as tenants in common and a receiver was appointed to manage the property, which receivership was terminated on November 30, 1971. She further alleged that she remarried and was now Verda Forester Williams. G. F. Forester also appeared and filed his claim. It was alleged that G. F. Forester had petitioned for bankruptcy and the receiver for the property of the former marriage, and the trustee in bankruptcy for G. F. Forester and the trustee for the bankruptcy of C. M. Rocca, Jr., joined and filed a claim.

(d) Paul L. Muth and Genevieve Muth were notified of the pendency of this action and given an opportunity to appear as plaintiffs. However, even though they were so notified, neither Paul L. Muth nor Genevieve Muth entered an appearance or made an appearance or made a claim. Instead, it developed that after the Park was established the Muths notified G. F. Forester and Verda M. Forester Williams that since they had paid no consideration for parcel No. 03–143, they elected to deed the land back to Mr. Forester and Mrs. Williams as joint tenants, by deed dated September 14, 1971. Accordingly, the claim for just compensation due for parcels 03–142 and 03–143 was presented by Mr. G. F. Forester and Mrs. Verda M. Forester Williams through the proper receiver and defendant interposed no objection considering that all parties had full notice of what had transpired. This ownership will hereafter be referred to as Forester-Williams.

10. The deed of trust due the Federal Land Bank of Berkeley in the principal sum of $19,782.83 as of June 23, 1970, plus interest was paid by defendant together with accumulated interest figured to October 20, 1972, in the sum of $23,240.88.

11. The deed of trust due Lawrence and Hazel M. Crivelli in the principal

sum of $210,257.20, plus interest, was also paid by defendant, together with accumulated interest figured to October 20, 1972, in the sum of $275,774.37.

12. The tax levy due the United States which was also the subject of a counterclaim filed in this action is in the sum of $3,695.37 with interest accumulating at the rate of 49 cents per day after August 1, 1972.

13. The deed of trust due C. M. Rocca, Sr. and C. M. Rocca, Jr., from G. F. Forester has not been released of record but since all parties to the transaction are parties to this case, the obligation is no longer a lien on the land but is transferred to whatever just compensation is found to be due in this case.

### Description of the Rocca and Forester-Williams Ownerships

14. The Rocca and Forester-Williams ownerships are located on the California Coast, in Del Norte County, adjacent to the Pacific Ocean, approximately 255–260 miles north of San Francisco, California, 50 miles north of Eureka, California, 35 miles south of the Oregon-California border, 20 miles south of Crescent City, California, and one and one-half to four miles south of the mouth of the Klamath River, a renowned fishing river. The property is approximately 45 minutes driving time from Crescent City. Although the trier of facts did not visit the property, many photographs in evidence show that it is located in exceptionally beautiful, albeit rugged country.

15. The three parcels comprising the Rocca ownership, 03–137, 03–139, and 03–141, represented 207.19, 80.10, 58.90 acres respectively. Old U.S. Highway 101, now a county road, comprised the eastern boundary of parcels 03–139 and 03–141, and bisects parcel 03–137. The western boundary of the Rocca parcels was the Pacific Ocean.

16. Only one of the parcels involved here had improvements constructed on it. Parcel 03–137 was improved with the Crivelli home, two concrete structures which formerly housed radar equipment, a main barn, shed, machinery shelter, and a corral and work area. The remaining Rocca parcels had no improvements.

17. The Rocca parcels are not contiguous. Parcels 03–137 and 03–139 are separated by High Bluff Quarry, parcel 03–138, and parcel 03–129 owned by the State of California. Parcels 03–139 and 03–141 are separated by Split Rock Quarry, parcel 03–140. Additionally, Rocca parcel 03–139 has a parcel, 03–131, owned by the United States, located within its boundaries and bordering on the ocean.

18. The parcels comprising the Forester ownership, 03–142 and 03–143, had a total acreage of 57.57 acres, and had no improvements. Old U.S. Highway 101 comprised the eastern boundary of these parcels, and the western boundary was the Pacific Ocean.

19. The distance from Old Highway 101 west to the ocean across the Rocca and Forester parcels ranges from approximately 1,000 to 1,200 feet and the height of the road above the ocean level ranges from 350–600 feet, roughly the height of a 40-story building although the contour levels off to a plateau at about 400 feet elevation. This ascent of 40 stories in 1,000 to 1,200 feet results in topography generally described as steep. The slope of the hillside, except for the plateau, is never less than a 30-degree slope. The property is covered with a number of apparent slides. The property east of the Old Highway 101 on Rocca parcel 03–137 rises to a crest and then falls away to the east. That portion of parcel 03–137 lying east of the crest has no ocean view. Rocca parcels 03–137 and 03–139 have sand beaches adjacent to the ocean. Rocca parcel 03–141 and Forester parcels 03–142 and 03–143 have no sand beaches except at low tide on occasion.

20. The property was described by all witnesses as being very attractive. It is covered with scattered conifer and alder trees, ferns, brush, and wildflowers and has considerable wildlife. There

was no evidence submitted as to the commercial value, if any, of the trees, and it has no redwood trees even though it is a part of the Redwood National Park.

21. The climate on the property is characterized by a large amount of rain and fog. Estimates of rainfall in the vicinity ranged from 70 to 105 inches per year. The property is subjected to a greater amount of cold, rain, and fog than is normally found on beach front property in Southern California or on property located several miles back from the coast in Northern California. The property was also described by some witnesses as windy and as being subject to more wind than property located inland. Despite Rocca Sr.'s testimony to the contrary, the weight of the evidence supports a finding that, generally speaking, the property in question was subjected to the same windy conditions that prevail along the Northern California coast.

22. The Rocca parcels and Forester-Williams parcels have the remnants of an old jeep trail running north-south through the property. However, parcels 03–138 and 03–142, not owned by Rocca, sever this old trail.

23. Due to the instability of the land, fill construction, and slope, there has been a history of problems connected with trying to maintain Old Highway 101 adjacent to the property. A portion of the highway was relocated to the east to a more stable location. The old road is prone to slip-outs. The slippage has totaled as much as 16 feet in places.

### Land Stability

24. Richard L. Meehan, a registered civil engineer, with a Master of Science degree in soil mechanics, testified on behalf of the defendant. He is the only witness who testified as to the stability of the soil. His professional specialty is in the area of soil mechanics, foundation engineering, and evaluation of geological problems, their diagnosis, treatment, and correction. The field of soil mechanics encompasses the identification and evaluation of the effects of certain types of ground movement.

25. Meehan worked with an associate, Mr. Douglas Hamilton, in studying this property. As a result of their investigation of the Rocca and Forester properties, Meehan and Hamilton prepared two maps, one a geologic map showing results of their field work, and one a development potential map, evaluating the conditions present on the property and the effect of these conditions on property use.

26. On the geologic map, a large number of areas are marked Q.L.S. which are defined as landslide deposits. Those Q.L.S. areas colored red are areas showing evidence of current or recent land movement, those areas colored orange are not known to be currently active, and those areas colored yellow are possible landslide areas.

27. The landslide deposits (Q.L.S. areas) were described as a predominately dark gray heterogeneous mixture of Franciscan formation sandstone, greenstone, and shale fragments in a matrix of clay and disaggregated shale. Most areas underlain by Franciscan formation are not as unstable as this property. The instability of this particular property, more severe than most reaches of the California Coast with which Mr. Meehan was familiar is due to a number of factors including: (1) a high percentage of clay in this Franciscan rock type, (2) continuous erosion of the base of the slope by the ocean, and (3) high rainfall, lubricating and softening materials.

28. The development potential map delineates the Rocca and Forester-Williams properties, and represents the development potential of those parcels for conventional type land development.

29. Meehan observed a number of signs of unstable ground on the Rocca and Forester-Williams properties. These included (1) characteristic land form for landslides, (2) active downslope shearing at base of cliff, above the beach,

(3) presence of hummocky ground associated with active landslide movement, (4) sliding of Old Highway 101, (5) erosion by waves at the base of cliff, and (6) exposed areas of gray soil suggesting recent erosion.

30. Meehan stated that a significant thickness of ground of 10–20 feet or more was gradually moving down slope with the lower end being consumed by the erosion of the Pacific Ocean.

31. The presence of high rainfall in this area is a factor in producing landslides.

32. Approximately 46 percent, roughly 100 acres, of Rocca parcel 03–137 is adequately stable for permanent structures of relatively low density. However, approximately 80 percent of Rocca parcel 03–139 and 87 percent of Rocca parcel 03–141, 75 percent of Forester-Williams parcel 03–142 and 25 percent of Forester-Williams parcel 03–143 are actively unstable and not suitable for permanent structures.

33. Curative or stabilizing costs for those portions of the property deemed not feasible for development of permanent building sites would be approximately $10,000 to $20,000 per acre.

34. With the exception of Rocca parcel 03–137, it would be either impossible or extremely expensive to develop any of the Rocca or Forester-Williams property for permanent residential structures.

### Valuation of the Rocca Parcels

35. Robert G. Ogle, appeared as an expert witness on valuation on behalf of Rocca. He testified that in his opinion the highest and best use of the property on October 2, 1968, was to hold it for future development although he could not estimate how soon such development would likely take place. He stated that in his opinion, the entire ownership of parcels 03–137, 03–139, and 03–141 had a fair market value of $500,000. He viewed the property as one entity, and used a market approach and sales approach to arrive at his evaluation.

36. Mr. Ogle did not separately value the improvements on parcel 03–137. After arriving at the $500,000 valuation, he allocated acreage values to the parcels in the following manner; 03–137 west of Highway 101, $2,000 per acre, 03–137 east of Highway 101, $1,200 per acre, and 03–141, $1,500 per acre, which produced an overall average of $1,500 per acre for the entire parcel.

37. H. Rich Bramwell also appeared as an expert witness on valuation in behalf of Rocca. He testified that in his opinion the highest and best use of the property as of October 2, 1968, was as an investment for future gain. He made no statement as to the length of time the property would be held before being developed. He also testified that in his opinion, the entire Rocca ownership of parcels 03–137, 03–139, and 03–141 had a market value of $475,000. This was an overall opinion, *i.e.*, he did not unitize or parcelize, and the improvements on parcel 03–141 were not separately valued.

38. Both Ogle and Bramwell relied primarily on two comparable sales in arriving at their respective valuations. The first sale was of 100 acres by one Thunen to individuals named Townsend and McMillian on July 18, 1966, for $75,000. Added to this price was an additional $4,000 expense to the purchasers arising out of the acquisition of several lots contained within the property. Thus, the total price might be viewed as $79,000 or $790 per acre. This sale will be hereafter referred to as "McMillian." The second sale was of 317.1 acres of the McNamara estate in a court auction held October 1, 1969, for $300,001. This sale will be hereafter referred to as "McNamara". Ogle viewed these as the two dominant comparables while Bramwell stated they were the two sales of most relevance.

39. Mr. Bramwell had studied the McNamara property from the standpoint of a potential purchaser-developer and he believed it to be superior to the Rocca parcel.

40. Neither Ogle nor Bramwell used the Cotton to Rocca exchange as a comparable. Ogle stated that good appraisal practices compelled him to disregard the exchange, while Bramwell stated that an exchange has too many variables to analyze as a market sale. Ogle and Bramwell both referred to subdivision properties in demonstrating an available market but agreed that the real estate subdivisions of Pacific Shores, Shelter Cove, and Sea Ranch are not comparable sales and they were not offered as such.

41. Curtis M. Rocca, Sr., plaintiff and one of the landowners, offered his opinion on the valuation of the property. Rocca's business experience, to a large extent, has been in agricultural processing and in export and import of foodstuffs and similar products. His appraisal experience has been mostly limited to the investigation he conducted for this particular property ownership. Nevertheless, he testified that in his judgment he had paid about $2,000 per acre for the entire Crivelli property on August 14, 1968, that the value as of October 1968 was $3,000 per acre, and that a minimum value was $2,000 per acre. His opinion was not supported by reference to any comparable sales nor by his own professional appraisers. Rocca's statement that he paid $2,000 per acre for the property was not supported by the record since the transfer was actually made on the basis of a trade, and the ranch in Oregon traded for this property was encumbered by a mortgage in favor of Connecticut General Life Insurance Company which was foreclosed shortly after the trade. There was no evidence that would support an assumption that the sale price of the Crivelli ranch to Rocca was any more than the sale price of the transfer from Crivelli to Cotton.

42. Hector R. Leslie appeared as an expert witness on valuation for the defendant. Leslie testified that in his opinion the highest and best use of the Rocca property, parcels 03–137, 03–139, and 03–141, was residential housing for summer type usage contingent upon physical characteristics of the sites, its location, access, environmental influences, and potential market of each type of use.

43. In Leslie's opinion the fair market value of 03–137 was $146,500, being approximately $600 per acre. This valuation included a $22,200 value for the improvements.

44. In Leslie's opinion the fair market value of 03–139 and 03–141 were respectively $52,000 and $38,300, being approximately $650 per acre for each parcel.

45. Leslie became familiar with the Rocca property while working for the Real Estate Research Corporation. As an employee of that corporation he supervised and participated in the appraisal of 110 parcels, (including 03–137, 03–139, and 03–141) which constituted the bulk of non-timber parcels in the Redwood National Park. For those appraisals he studied all sales in Del Norte County from 1963 to 1968.

46. In preparing his first appraisal, Mr. Leslie had access to the land stability report prepared by Richard L. Meehan and Douglas Hamilton although his initial report on soil conditions was based on his personal observation.

47. Mr. Leslie used a market approach in arriving at his estimation of the market value of the Rocca property and relied primarily on four comparable sales. The first sale was the sale of the entire 533 acres of Crivelli property on June 1, 1968, from Crivelli to Bill Cotton for $265,000, being approximately $500 per acre. The second sale was the McMillian sale previously described. The third sale was the sale of 100 acres by one Fisher to Firsick on October 4, 1972, for $80,000, being the equivalent of $800 per acre. Finally, the fourth transaction was the consideration of an option to purchase a 510-acre parcel owned by Murphy and Menery for approximately $300,000 or $526 per acre by C. M. Rocca, Jr. on September 30, 1968. The Murphy-Menery property was on the

coast and immediately north of the Klamath River.

48. Harold Trott, a resident of Eureka, California, also appeared as a witness for defendant. He is familiar with the beach front along the northern coast of California from Shelter Cove to the Oregon line and, aside from the Redwood National Park area, has made in excess of 16 appraisals of ocean front property. He appraised in excess of 20 parcels for the National Park Service in the acquisition of the Redwood National Park.

49. Trott testified that in his opinion the highest and best use of Rocca parcel 03–137 was to four-split. Four-split is a term used to describe a practice of developers to divide each separate land holding into four tracts for sale. Under the California statutes, an owner may divide each separate holding into four parts without such division being considered a subdivision and thus avoid certain restrictions and requirements associated with subdividing. In his opinion, the fair market value of 03–137 was $167,200, being approximately $800 per acre. This valuation included a value of $20,000 given the improvements located on that property.

50. Trott considered the highest and best use of Rocca parcels 03–139 and 03–141 was to four-split each parcel. In his opinion the fair market values of 03–139 and 03–141 were respectively $32,000 and $29,450, being approximately $400 per acre for each parcel.

51. Trott used the market value approach in arriving at his estimation of the value on the Rocca property and relied primarily on three comparables. The first sale was the original sale of the entire 533 acres of Crivelli property on June 1, 1968, to Bill Cotton for $265,000, being approximately $500 per acre. The second sale was one of 100 acres by Fisher to Firsick on October 4, 1972, for $80,000, being 800 per acre, and the third sale was the McMillian sale referred to also by Ogle, Bramwell, and Leslie.

52. The McNamara property was listed on the market for sale at the time he prepared his appraisal, but it did not sell until October 1, 1969. Since this sale did not occur until one year after the date of taking, it was not used as a comparable by either Leslie or Trott.

*The Comparable Sales Used in the Valuation of the Rocca Property*

53. Crivelli to Cotton: On June 1, 1968, Bill Cotton purchased the 533 acres of the Crivelli property for $265,000, being approximately $500 per acre. The Crivelli property included all Rocca and Forester property involved in this litigation, as well as the 12-acre parcel Cotton transferred to Ellis Roberts on August 23, 1968, and the two-quarry site parcels 03–138 and 03–140 acquired by Crossley. Plaintiffs' assertion that these were "forced" sales is not supported by the record as a whole.

54. "McMillian": Thunen sold 100 acres of land for $75,000 on July 18, 1966, to Townsend and McMillian. Added to this price was an additional $4,000 expense to the purchasers arising out of the acquisition of several lots within the property. Thus, the total price was considered to be approximately $790 per acre. Earlier, however, Trott had appraised this property at between $80,000 and $120,000.

55. This property is located on the coast 3½ miles north of the Rocca property, 1½ to 3 miles north of the Klamath River and ½ mile south of Wilson Creek Cove.

56. The McMillian property is bounded on the west by the Pacific Ocean and fronts on Highway 101 for approximately 400 feet. A small portion of the property may lie across or to the east of Highway 101.

57. The property has commercial possibilities because of its frontage on heavily travelled Highway 101, and the location of a noted tourist attraction, the Trees of Mystery, approximately one-half mile to the south of Highway 101.

58. When compared to the Rocca parcel, McMillian is less steep, flatter, and topographically superior. Although one of plaintiff's appraisers initially testified that "McMillian" was subject to "active landslides", he later stated that he meant to say that "McMillian" was subject to "active earthquakes." In addition to frontage on Highway 101, the property is served by an old logging road.

59. At the time Thunen and McMillian purchased this property for approximately $790 per acre, the Crivelli property three and a half miles to the south was also on the market for sale.

60. "Firsick": On October 4, 1967, W. D. Fisher sold 101.9 acres to W. J. Firsick for $80,000 being approximately $800 per acre. This sale included the price of a substantial house and barn located on the property which was valued at approximately $22,000 to $24,000. "Firsick" is about one-half mile south of the Oregon-California border on Old Highway 101, now Oceanview Drive. Its western boundary, Oceanview Drive, ranges from 1,400 to 2,000 feet from the ocean. The property is nestled on the side of a hill and is traversed by Gilbert Creek. Kamph Memorial Park and Pelican Beach State Park are within one-half mile, and both parks provide beach access. An ocean view is visible from all of the property with a considerable percentage of that view being characterized as white water.

61. "McNamara": The sale of 317.1 acres of the McNamara estate was made in a court auction held October 1, 1969, for $300,001, being approximately $942.50 per acre. The agreement contained a release clause under which title was conveyed to the buyer in the interior of the property for $1,000 an acre and $3,000 an acre for ocean front property.

62. This is ocean front property located on Point Saint Georges, approximately one-half mile northwest of Crescent City, and adjacent to Crescent City Airport. The property has a beach and a wildlife marsh which enhances its value. In comparison with the Rocca and Forester property, the McNamara property has better access to utilities, is closer to commercial establishments such as drugstores, movies, hospitals, etc., has better topography, less slippage, and good interior access.

63. This sale took place one year after the date of taking. At the time of this sale the creation of the park had reduced the amount of seashore and recreation type land available for sale.

64. Mr. Bramwell, plaintiff's appraiser, had thoroughly studied the McNamara property from the viewpoint of a potential purchaser-developer, and he believed it to be superior to the Rocca parcel.

*Valuation of Forester-Williams Parcels*

65. George Francis Forester is the owner of an undivided one-half interest in the Forester-Williams property. Forester, a real estate broker, testified that he assisted C. M. Rocca and C. M. Rocca, Jr. in their exchange dated August 14, 1968, of the Viewpoint Ranch to Bill Cotton for the Crivelli Ranch. He stated that his commission on the exchange was $103,000. In payment of that commission, he received a promissory note dated September 17, 1968, from C. M. Rocca, Sr. and C. M. Rocca, Jr. for $100,000, and a $3,000 note from Curt Rocca, Jr. which has never been paid.

66. Forester and Rocca entered into a real estate purchase contract on September 20, 1968, for parcels 03–142 and 03–143. The $100,000 note was deposited as part of the purchase price along with a deed of trust executed by Forester in the amount of $30,000 in exchange for the property. The $30,000 Forester deed of trust has never been paid.

67. Forester testified that the highest and best use of the property was to subdivide it for use as a trailer park or campground so that, since mobile camps are self-contained, there would be no need for electrical power, toilets,

and water. Vehicle access to the Forester property from Old Highway 101 was virtually non-existent. Forester did not have an easement across the Rocca property to the north or privately owned property to the south. The most feasible possibility of access was to build a series of steps down the slope.

68. Although Mr. Forester's previous appraisal experience had been limited to appraising two prune orchards, he stated that his property had a valuation of at least $4,000 per acre. Forester used no comparable sales in arriving at this valuation, made no effort to determine the price originally paid by Bill Cotton to Lawrence Crivelli for the entire 533 acres, and relied on data regarding the prices of ocean front property in southern California in arriving at his valuation.

69. Verda M. Forester-Williams testified that she is the owner of an undivided one-half interest in the Forester property.

70. Gerald S. Higgs appeared as an expert witness on valuation in behalf of Forester-Williams. Higgs did not have access to geological data when he made his appraisal; thus he testified that his original idea of the highest and best use of the property was for non-urban residential subdivision property. Since the subsequent engineering report indicated that there were possibilities of slides on property, however, he revised his highest and best use to cluster housing and/or recreational second homes on selected locations. He envisioned six pad sites with eight homes on each pad site. He could not, however, identify the precise location of the pad sites for cluster developments. His subsequent revision of the highest and best use did not affect his appraisal value.

71. The Forester-Williams parcels were located at the point where the road showed the most slippage and the terrain was the steepest. It would be impossible to construct access to these parcels from the adjacent road. Consideration was given to constructing off-site parking or securing right-of-way from neighboring properties. No rights-of-way were available from neighboring tracts. The only access from the road to the water's edge would be by stairs constructed down the hillside for a distance equal to the equivalent of a 35- to 40-story building.

72. Higgs testified that in his opinion the Forester-Williams ownership, parcels 03–142 and 03–143, had a fair market value of $230,000, approximately $4,000 per acre. This valuation included that property previously identified or associated with Muth. He stated that his appraisal value was made on the property as a unit, not on an acreage basis.

73. Higgs relied on the market data approach and used three comparables in arriving at his valuation. These were: (1) the sale of 12 acres by Cotton to Roberts on August 23, 1968, for $60,000; (2) the sale of one acre from Roberts to Stanson on September 24, 1968, for $7,500, and (3) the Pacific Shores Subdivision. At a later point, however, he admitted that the entire Pacific Shores was not a comparable and was too far removed in time.

74. The comparables used by Gerald B. Higgs are described by Higgs as follows:

a. Cotton transferred to Ellis Roberts on August 23, 1968, 12 acres for $60,000, or $5,000 per acre. The parcel was located north and adjacent to Rocca parcel 03–137 between Old Highway 101, and the ocean. Higgs testified that this parcel was flat on top, had flat area, and was level. The parcel has a beach adjoining the ocean. This parcel was equipped with electricity and telephone, had water available, and had direct access to Old Highway 101. He stated that the highest and best use was residential.

b. Roberts sold to Stanson on September 24, 1968, one acre for $7,500. This acre, one of those received by Roberts from Cotton on August 23, 1968, was immediately north of and adjacent to

Rocca parcel 03–137. The topography of this parcel could be characterized as flat to downhill flat. It has a beach adjoining the ocean. It was equipped with the same utilities and had the same ease of access to Old Highway 101 as the entire 12 acres of the Roberts parcel. The highest and best use was residential.

75. The third comparable used by Higgs was the Pacific Shores Subdivision. This property consisted of 800 acres located on sandy ground, sold on March 5, 1963, for $284,000, being approximately $355 per acre. It is located north of Crescent City and west of Fort Dick. The property borders on the Pacific Ocean, Lake Talawa, and Lake Earl.

Higgs testified that Pacific Shores was not a comparable sale. Nevertheless, he appeared to have given consideration to one-third acre ocean front lots at Pacific Shores which sold for $9,900. He admitted, however, that the smaller the piece of property, the higher the price.

76. Harold W. Trott, defendant's expert witness on valuation, testified that in his opinion the highest and best use of the Forester-Williams parcels, 03–142 and 03–143, was for the location of three building sites for construction of light cabins. In his opinion the fair market value of the Forester property was $23,000.

Trott used the market approach in fixing the fair market value of the Forester-Williams property and relied on the following comparables; (a) the original sale of the Crivelli property on June 1, 1968, to Bill Cotton for $500 per acre, (b) the Firsick sale, (c) the McMillian sale, and (d) a series of options acquired by Edward Shaffnit on property in the Big Lagoon, Stone Lagoon area, south of Orick, about 30 miles north of Eureka, to purchase property for amounts ranging from $500 to $740 per acre.

In reaching his valuation, he considered a number of small site sales, not as comparables but for perspective and as a check on the straight-through method. The small sites he analyzed included: (a) the Ed Richards to Tony Felipe sale of a half-acre to an acre at the mouth of the Smith River in September 1967, for $10,000 and (b) Sale No. 20, of 1.3 acres of ocean frontage on the Trinidad coast in May 1968 for $8,250.

### ULTIMATE FINDING OF FACT

77. On the basis of the entire record, it is found that, as of October 2, 1968, (1) the Rocca parcels viewed as a unit had a fair market value of $475,000, or approximately $1,400 per acre, and that (2) the Forester-Williams parcels as a unit had a value of $57,570, or approximately $1,000 per acre.

### CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that:

(1) Judgment is hereby entered in favor of C. M. Rocca, Sr. and A. E. Miller, trustee in bankruptcy for C. M. Rocca, Jr. and Rosemary Rocca, his wife, for the taking of parcels 03–137, 03–139, and 03–141 in the sum of $475,000 plus interest at the rate of 6 percent per annum from October 2, 1968, but such judgment shall be subject to credits for liens paid by defendant to the Federal Land Bank of Berkeley and to Lawrence and Hazel M. Crivelli in the total sum of $299,015.25, and further subject to the payment of the United States tax lien in the sum of $3,695.37 as of August 1, 1972, with interest accumulating thereafter at the rate of 49 cents per day. It is further ordered that the amount, if any, remaining due on the judgment herein entered shall be paid to C. M. Rocca, Sr. and A. E. Miller, trustee in bankruptcy, as their interests shall appear, by defendant from moneys presently available un-

der the appropriations made for the Redwood National Park pursuant to Public Law 90–545, 9th Congress, 2d Session, approved October 2, 1968.

(2) It is further ordered that judgment be and the same is hereby entered in favor of A. E. Miller, trustee for G. F. Forester, Verda Forester Williams and C. M. Rocca, Jr., and also to C. M. Rocca, Sr., and the Bank of America National Trust and Savings Association, as their interest may appear, for the taking of parcels 03–142 and 03–143 in the sum of $57,570 plus interest at the rate of 6 percent per annum from October 2, 1968, until paid, such payments, as hereinbefore mentioned to be made by defendant from moneys presently available from the appropriations made for the Redwood National Park, pursuant to Public Law 90–545, 90th Congress, 2d Session, approved October 2, 1968.

(3) It is further ordered that judgment be and the same is hereby entered denying recovery of litigation expenses by the plaintiffs.