**INDEPENDENCE PARK APARTMENTS, et al., Plaintiffs,**

**v.**

**UNITED STATES, Defendant.**

**No. 94–1A–C.**

United States Court of Federal Claims.

Aug. 27, 2004.

Everett C. Johnson, Jr., Latham & Watkins, Washington, D.C., for plaintiffs. With him at trial were Susan Azad and Paul A. Allulis, Latham & Watkins, Washington, D.C. With him at closing arguments were Richard P. Bress and Ms. Azad, Latham & Watkins, Washington, D.C.

Kenneth M. Dintzer, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Peter D. Keisler and David M. Cohen, Director, Commercial Litigation Branch. With him at trial and on the post-trial briefs were Kenneth D. Woodrow and Michael F. Bahler, Trial Attorneys, Commercial Litigation Branch, Washington, D.C.

### OPINION AND ORDER

LETTOW, Judge.

This case is before the court after a five-day trial on issues associated with adjustments to a damages award for a temporary regulatory taking. The case is an offshoot of *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed.Cir.2003) ("*Cienega VIII*"), which originally involved contractual and takings claims arising with federally supported low-income housing projects. It is now pending before the court on its third remand from the Court of Appeals. In *Cienega VIII*, the Federal Circuit ordered reinstated a damages award previously entered by this court after an original trial in 1996 on the contractual claims of four "model plaintiffs." 331 F.3d at 1353. At this juncture, the court was presented with the narrow assignment on remand from the Federal Circuit of determining whether, and to what extent, the reinstated award should be adjusted to compensate plaintiffs for the temporary taking they suffered.

The court severed the claims of the four entities that had served as the model plain-

tiffs,[1] and what essentially amounted to a retrial on those four plaintiffs' damages awards was conducted on May 3–7, 2004. Based upon the evidence adduced at trial and for the reasons set out below, the court finds that Independence Park is entitled to a just-compensation award of $788,028.94, Pico Plaza is entitled to $138,761.63, St. Andrews Gardens is entitled to $1,638,201.20, and Sherman Park is entitled to $859,049.22. Each award includes interest on a compounded basis at the rate for 10–year Treasury STRIPs from the end of their respective takings periods, as explained below.

## PROCEDURAL BACKGROUND

A truncated recitation of the long and tortuous procedural history of this case provides a context for the issues addressed at trial. The plaintiffs are four entities that were selected as "model plaintiffs" for purposes of trial and case administration in *Cienega Gardens v. United States*, No. 94–1C ("*Cienega*"). All forty-two plaintiffs in *Cienega* were owners of low-income housing units that filed suit seeking redress in connection with the passage of the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA" or "Title II"), Pub.L. No. 100–242, tit. II, 101 Stat. 1877 (1988) (codified at 12 U.S.C. § 1715*l* note), and the Low–Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA" or "Title VI"), Pub.L. No. 101–625, tit. VI, 104 Stat. 4249 (1990) (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. §§ 4101–4124), which nullified plaintiffs' options to prepay their federally subsidized mortgages after 20 years, thus barring them from removing the regulatory restrictions on rental and use of their property. *See Cienega VIII*, 331 F.3d at 1323. The plaintiffs' original complaint in *Cienega* encompassed claims based on a breach of contract theory as well as on alleged categorical

and regulatory takings under the Fifth Amendment. *Id.* at 1324. In 1996, Judge Robinson of this court conducted a trial on the model plaintiffs' breach of contract claims and subsequently in 1997 ruled in favor of those plaintiffs, awarding $3,061,107 in damages. *Cienega III*, 38 Fed.Cl. at 66. On appeal, the Federal Circuit reversed this court's breach of contract judgment, ruling that the plaintiffs lacked privity of contract with the government. *Cienega Gardens v. United States*, 194 F.3d 1231 (Fed.Cir.1998) ("*Cienega IV*").

On remand, Judge Hodges of this court dismissed plaintiffs' takings claims. *Cienega Gardens v. United States*, 46 Fed.Cl. 506 (2000) ("*Cienega V*"). On appeal of that ruling, the Federal Circuit held that the regulatory takings claims were ripe for adjudication and again remanded the matter to this court. *Cienega Gardens v. United States*, 265 F.3d 1237 (Fed.Cir.2001) ("*Cienega VI*"). On the second remand, Judge Hodges granted summary judgment to the government, ruling that the plaintiffs did not have vested property rights and that, if any taking had occurred, it could not have been a compensable taking as a matter of law. *Cienega Gardens v. United States*, No. 94–1C (Fed.Cl. Jan. 8, 2002) (order granting summary judgment) ("*Cienega VII*").

The Federal Circuit overturned that grant of summary judgment on appeal in *Cienega VIII*. In doing so, the Federal Circuit ruled that the *Cienega* plaintiffs did hold vested property rights and were not legally barred from potential recovery. *Cienega VIII*, 331 F.3d at 1353–55. Additionally, as to the four model plaintiffs, the Court of Appeals held that the record justified a finding that those plaintiffs, whose claims had already been ventilated at trial, had suffered a compensable, temporary, regulatory taking. *Id.* at 1353. Respecting those plaintiffs, the court

---

1. Plaintiffs are real estate partnerships, each named for the apartment complex in Los Angeles, California, that it owns: Independence Park Apartments ("Independence Park"), Sherman Park Apartments ("Sherman Park"), St. Andrews Gardens Apartments ("St. Andrews"), and Pico Plaza Apartments ("Pico Plaza"). *See Cienega Gardens v. United States*, 38 Fed.Cl. 64, 67 n. 3 (1997) ("*Cienega III*"). The plaintiffs' properties

are all managed and overseen by Goldrich & Krest Management Company ("G & K Management"). Trial Tr. ("T.Tr.") at 79–81.

With the severance of these four plaintiffs from the original *Cienega Gardens* case, that case retains thirty-eight separate plaintiffs whose claims still remain to be heard. Trial is scheduled to commence on November 8, 2004, on the claims of five of those plaintiffs.

ordered that "the original damages judgment entered in *Cienega* [after the trial on a breach of contract theory in 1996] be reinstated in the amount awarded therein for each of the four Model Plaintiffs." *Id.* In its mandate to this Court regarding the reinstatement of the model plaintiffs' damages award, the Federal Circuit directed that "[o]n remand, the trial court may adjust the original damages award reinstated by this court if it is shown by either party not to compensate accurately for the regulatory taking, and may also determine whether interest is or is not due." *Cienega Gardens v. United States*, No. 02–5050 (Fed.Cir. Nov. 5, 2003) (Judgment and Mandate). Regarding the thirty-eight plaintiffs who were not model plaintiffs, the court held that sufficient evidence did not exist on the record to conduct an analysis of their takings claims under the regulatory takings principles set out in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), and it remanded those claims for development of an appropriate factual record. *Cienega VIII*, 331 F.3d at 1353–54.

To comply with the remand instructions from the Federal Circuit, the instant case styled *Independence Park Apartments, et al. v. United States*, No. 94–1A–C, was severed from the original *Cienega* case and proceeded to trial on issues associated with the reinstated damages award. Because the Federal Circuit's mandate in *Cienega VIII* ordered the original judgment in *Cienega* to be reinstated with adjustments, this court placed the burden of producing evidence of the need for and amount of adjustment on the party seeking such adjustment. Thus, the overall burden of proof remained with plaintiffs, but both the plaintiffs and the government had the burden of producing evidence at trial.

---

**2.** The facts relevant to the Federal Circuit's determination that plaintiffs have suffered a temporary taking were previously recounted in *Cienega VIII*, 331 F.3d at 1319–54. Likewise, this court provided a detailed account of the facts upon which the original award of damages was based in *Cienega III*, 38 Fed.Cl. at 72–89. Accordingly, the court has set out here only a general outline of the relevant facts previously relied upon by this court and the Court of Appeals, plus additional facts developed at the retrial specifically related to resolution of the various legal princi-

Hr'g Tr. at 16–17, 23–24 (Jan. 14, 2004); Hr'g Tr. at 18–19 (Jan. 28, 2004).

## FACTS [2]

In the early 1970s, each of the plaintiffs executed a forty-year mortgage on their respective properties pursuant to one or the other of two federal programs intended to subsidize low-income housing.[3] *Cienega III*, 38 Fed.Cl. at 67–68. In conjunction with these mortgages, plaintiffs entered into regulatory agreements that "placed a variety of restrictions on the Owners, including restrictions on the income levels of tenants, allowable rental rates, and the maximum rate of return on initial equity that the Owners could receive from their housing projects." *Cienega VIII*, 331 F.3d at 1325. The agreements with HUD also prevented plaintiffs from prepaying their mortgages during the first twenty years of the mortgages' lives absent approval from HUD but allowed prepayment, free from any pre-approval requirement, after twenty years. *Id.* Upon pay-off of the mortgages, the restrictions embodied in the regulatory agreements with HUD would have been lifted. The prepayment dates for the four properties under their original agreements would have been as follows:

| | |
|---|---|
| Independence Park | June 11, 1993 |
| Pico Plaza | December 27, 1993 |
| St. Andrews | December 19, 1991 |
| Sherman Park | September 12, 1992 |

*Cienega III*, 38 Fed.Cl. at 69.

As the twenty-year anniversaries of plaintiffs' signing of their mortgages and regulatory agreements were drawing near, Congress enacted two pieces of legislation that removed the right to pre-pay. First, ELIHPA, passed in 1987, placed a two-year moratorium on prepayments. *Cienega VIII*, 331 F.3d at 1326. Next, LIHPRHA, passed upon ELIHPA's expiration, extended the prepayment

---

ples at issue in this case. The evidentiary record in this case consists of Joint Exhibits ("JX"), Plaintiffs' Exhibits ("PX"), Defendant's Exhibits ("DX") and the testimony provided at retrial, as reflected in the trial transcript.

**3.** Plaintiffs' mortgage loans were insured pursuant to either Section 221(d)(3) or Section 236 of the National Housing Act, codified as amended at 12 U.S.C. §§ 1715*l* (d)(3), 1715z–1. *Cienega III*, 38 Fed.Cl. at 67.

moratorium indefinitely. *Id.* Together, "these statutes annulled the provision of the mortgage trust notes that prepayment was allowed after twenty years without HUD approval." *Id.* (internal quotation and alteration omitted).

Through both ELIHPA and LIHPRHA, Congress empowered HUD to enter into "Use Agreements" with property owners to provide incentives for the continued provision of affordable housing, although Congress did not fully fund the Use Agreement program under LIHPRHA. *See Cienega III,* 38 Fed. Cl. at 69 & n. 8; T. Tr. at 128–29. Then, six years after passage of LIHPRHA, Congress did a *volte-face* when it passed a third piece of relevant legislation, the Housing Opportunity Program Extension Act of 1996 ("HOPE Act"), Pub.L. No. 104–120, 110 Stat. 834 (March 28, 1996) (codified in scattered sections of Titles 12 & 42 of the U.S.Code), which restored the ability to prepay a HUD-insured mortgage, provided that the mortgagor agreed not to increase rents at the property for sixty days after paying off the mortgage. *Cienega III,* 38 Fed.Cl. at 70. The HOPE Act "essentially lifted" the restrictions imposed by ELIHPA and LIHPRHA. *Cienega VIII,* 331 F.3d at 1326–27.

Prior to the passage of the HOPE Act, Sherman Park and St. Andrews entered into Title II Use Agreements under ELIHPA. JX 23; JX 51. These Use Agreements provided the properties with benefits in the form of certain rent subsidies and required that regardless of mortgage prepayment the owners would continue to be bound by certain terms of the Regulatory Agreements signed in connection with the original mortgage insurance agreements. *See* JX 23 at 8; JX 51 at 8.[4] In addition to the Use Agreements, Sherman Park and St. Andrews, as well as Independence Park, entered into "Section 8 Housing Assistance Payment ('HAP') contracts pursuant to 24 C.F.R. § 886, Subpart A; the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.;* and the HUD Devel-

opment Act, 42 U.S.C. § 3531, *et seq.*" *Cienega III,* 38 Fed.Cl. at 70.[5] *See* JX 8; JX 37; JX 61. These HAP contracts antedated the Use Agreements, having been initially executed during the 1980s. *See Cienega III,* 38 Fed.Cl. at 70. They provided rental subsidies to tenants but "restricted the use of low income rental units and the rents chargeable" on those units. *Id.* The HAP contracts did not affect a property owner's prepayment rights under a HUD-insured mortgage, although the owners did agree within the HAP contracts to operate under HUD restrictions even in the event such a mortgage were paid off. *Id.* The HAP contracts had initial terms of five years, and these three plaintiffs each renewed their respective HAP contracts for successive additional terms. *Id.* ("Throughout the 1980s and the early 1990s, the owners of these three model properties renewed the effective terms of these HAP contracts for five-year periods."). *See* JX 8–10; JX 37–39; JX 61–63. Upon passage of the HOPE Act, Independence Park prepaid its HUD-insured mortgage. T. Tr. at 129. None of the other plaintiffs have paid off their mortgages. *Id.*

On January 17, 1994, Southern California experienced a severe earthquake that caused damage to all four properties. In response to this natural disaster, Congress established the HUD Earthquake Loan Program ("HELP"), which provided low-interest loans to HUD-insured mortgagors whose properties were damaged. Plaintiffs obtained these loans, which carried a one percent interest rate, with payments due only upon the maturation date of the mortgage. T. Tr. at 145–46. By accepting the HELP loans, plaintiffs agreed that they would not pay off their HUD-insured mortgages until the HELP loans were paid. Only Independence Park has paid off its HELP loan to date. *Id.*

Each of the four plaintiffs' properties is managed by G & K Management. At trial, Carole Glodney, President of G & K Management testified about plaintiffs' experiences

---

4. Independence Park and Pico Plaza also applied for Title VI Use Agreements pursuant to LIHPRHA, JX 73; JX 86, but such agreements were never concluded because Congress did not allocate sufficient appropriations to fund all approved Title VI properties. T. Tr. at 128–29.

5. Acceptance of assistance under a Section 8 HAP Contract was a condition of Sherman Park's and St. Andrews's Title II Use Agreements. *See* JX 23 at ¶ 11; JX 51 at ¶ 11.

with their HUD-insured mortgages and with other developments at the properties since the 1996 trial. T. Tr. at 78–172. Plaintiffs presented a damages model created and applied by their economics expert, Dr. Richard Peiser, a professor at Harvard University. T. Tr. at 173–457. Dr. Peiser had testified as plaintiffs' expert at the original trial. He testified at the retrial about changes that he made to the model in light of the developments in this case since *Cienega III,* the application of his model to adjust the original damages award, and provision for interest as a part of the award.

For its part, the government presented expert testimony from two witnesses, Dr. William Hamm and Dr. Darrell Duffie. Dr. Hamm presented arguments intended to undermine plaintiffs' damages model and to provide alternative methods for the calculation of interest. T. Tr. at 561–701, 884–996. Dr. Duffie, a professor at Stanford University, provided further critiques of Dr. Peiser's model and presented his own model for calculating damages. T. Tr. at 709–877. The government also called as adverse factual witnesses Michael Drandell, Vice–President and Controller of G & K Management, T. Tr. at 502–57, and Warren Breslow, Partner and Treasurer of G & K Management, T. Tr. at 460–94, respecting the plaintiffs' finances. Anna Ortega, Assistant Director of the Rent Stabilization Division for the City of Los Angeles, California testified regarding the effects and application of the Los Angeles Rent Stabilization Ordinance. T. Tr. at 998–1026.

## DISCUSSION

In light of the Federal Circuit's determination that plaintiffs suffered a temporary regulatory taking and that the court's prior judgment should be reinstated, the issues that arise on remand are whether and to what extent the original damages award should be adjusted to compensate plaintiffs adequately for their loss. Plaintiffs assert that the original award should be adjusted in two ways: first, by increasing the award to account for "the cash flows they lost as a result of the taking after the original 'window period' that was the subject of the 1996

trial," Pls.' Post–Trial Mem. at ¶ 44, and, second, by awarding compound interest. *Id.* at ¶ 37. In contrast, the government asserts broadly that "the Court should reject the 1997 breach-of-contract award." Def.'s Post–Trial Br. at 21. It seeks a total reconsideration of the measure of compensation to which plaintiffs are entitled and argues that plaintiffs at most should be awarded only nominal damages and simple interest on those damages. *Id.* at 61–69.

### A. The Mandate Rule and Law of the Case

As an initial matter, consideration of the arguments and evidence presented by both sides in favor of adjustment of the reinstated award requires application of two related legal principles—the "mandate rule" and the "law of the case" doctrine. Plaintiffs, as a general matter, argue that this court should be bound by the prior decisions of the Court of Appeals in the *Cienega* line of opinions and that the court should adhere to the letter and the spirit of the Federal Circuit's mandate in considering the damages award resulting from the 1996 trial. Plaintiffs nonetheless urge that the court should look beyond prior findings and consider subsequent damages that have allegedly since been incurred as a result of the taking. The government, on the other hand, asserts that neither the mandate rule nor the law of the case doctrine should preclude the court from reaching new conclusions as to the economic harm suffered by plaintiffs but that the Court should constrain itself to examining the time period considered in prior decisions. In particular, the government argues that the reinstated judgment is entitled only to a presumption of validity and that such presumption can be rebutted through new evidence. The government uses the metaphor of a "bursting bubble" to signify a rebutted presentation. T. Tr. at 22–28 (closing argument, June 30, 2004). The court rejects this argument by the government, and instead it applies the mandate rule and the law of the case doctrine, for the following reasons.

This court is directly bound by the mandate issued by the Federal Circuit in conjunction with its decision in *Cienega VIII.* "When a judgment of a trial court has been

appealed, the decision of the appellate court determines the law of the case, and the trial court cannot depart from it on remand." *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1550 (Fed.Cir.1988), *rev'd in part on other grounds by A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1038–39 (Fed.Cir.1992) (en banc). *See also O'Conner v. United States*, 60 Fed. Cl. 164, 169 (2004). *Cf. Florida Power & Light Co. v. United States*, 56 Fed.Cl. 555 (2003), *rev'd for failure to follow mandate*, 103 Fed.Appx. 669 (Fed.Cir.2004). When this court is instructed to undertake proceedings on remand from the Federal Circuit, it "is free to take any action that is consistent with the appellate mandate, as informed by both the formal judgment issued by the [appellate] court and the [appellate] court's written opinion." *O'Conner*, 60 Fed.Cl. at 169 (quoting *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1484 (Fed.Cir. 1998)). "Interpretation of an appellate mandate entails more than examining the language of the court's judgment in a vacuum." *Exxon Chem. Patents*, 137 F.3d at 1483.

In this instance, the court has a precise mandate stemming from a lengthy and detailed opinion in *Cienega VIII*. The Federal Circuit specifically ordered that "the original damages judgment entered in *Cienega III*, 38 Fed.Cl. 64, be reinstated in the amount awarded therein." *Cienega VIII*, 331 F.3d at 1353. In the formal mandate, the Federal Circuit instructed that "[o]n remand, the trial court may adjust the original damages award reinstated by this court if it is shown by either party not to compensate accurately for the regulatory taking, and may also determine whether interest is or is not due." *Cienega Gardens v. United States*, No. 02–5050 (Fed.Cir. Nov. 5, 2003) (Judgment and Mandate). To the extent that any legal or factual issues are resolved by the Federal Circuit's reinstatement and accompanying analysis, the mandate rule applies, and this court is bound by the Federal Circuit's action. Manifestly, however, the mandate in this case provides the court with a degree of leeway, if the reinstated judgment does not "compensate accurately for the regulatory taking." *Id.* To the extent that any particular factual or legal issue falls within the scope

of that leeway, the court will apply the law of the case doctrine, as appropriate, unless justification for departure from that doctrine has been established.

"As most commonly defined, the doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (internal brackets omitted; quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). The law of the case doctrine is a prudential, judicial creation, "the purpose of which is to prevent relitigation of issues that have been decided[,] . . . protect the settled expectations of the parties[,] and promote orderly development of the case." *Suel v. Sec'y of Health & Human Servs.*, 192 F.3d 981, 984 (Fed.Cir.1999) (citations omitted; citing *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed.Cir.1995); *Mendenhall v. Barber–Greene Co.*, 26 F.3d 1573, 1582 (Fed.Cir. 1994); *Little Earth of the United Tribes v. Dep't of HUD*, 807 F.2d 1433, 1441 (8th Cir.1986)). Importantly, the doctrine applies only when a prior decision in the case was explicitly on point and conclusively addressed the question at issue. *Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 n. 12 (Fed. Cir.1995); *Jamesbury Corp.*, 839 F.2d at 1550. Moreover, the law of the case doctrine is not an absolute prohibition on reconsideration of prior elements of a case. "Reasons that may warrant departure from the law of the case . . . include the discovery of new and different material evidence that was not presented in the prior action, or an intervening change of controlling legal authority, or when the prior decision is clearly incorrect and its preservation would work a manifest injustice." *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 698 (Fed.Cir.2001) (citing *Smith Int'l Inc. v. Hughes Tool Co.*, 759 F.2d 1572, 1576 (Fed.Cir.1985)).

### B. Relevant Takings Periods

A key determination in resolving the parties' divergent requests for adjustment of the damages award in this case is the delin-

eation of the relevant takings period, *i.e.*, the period for which plaintiffs are due compensation for their loss. During the original trial on damages in 1996, the court considered damages that had been incurred by plaintiffs between their respective original prepayment dates and either the expiration of the sixty-day rent-increase moratorium that followed passage of the HOPE Act (in the case of Independence Park and Pico Plaza) or the date of the signing of the properties' Title II Use Agreements (in the case of Sherman Park and St. Andrews). *See* PX 200 at ¶¶ 7, 12. Plaintiffs argue that, as regards Sherman Park, St. Andrews, and Independence Park, the Court should consider alleged losses incurred after the time of the 1996 trial, effectively extending the takings period. Plaintiffs' position rests on two grounds. First, they argue that these properties were "forced" to enter into the Use Agreements and HAP contracts as mitigation for their takings loss. Pls.' Post–Trial Mem. at 67. Therefore, they contend that any shortcoming of their mitigation effort should continue to be treated as damages arising from the taking. Second, they assert that the Use Agreements and HAP contracts have not provided plaintiffs with the anticipated benefits to alleviate their takings damages due to the government's failure properly to adjust the rental rates associated with Section 8 certificates upward as the market has risen. *Id.* at 66–67. For these reasons, plaintiffs urge the court to determine the alleged damages that have continued to accrue since the 1996 trial and to treat those added amounts as takings damages for which just compensation is due.

In support of plaintiffs' assertion that the Use Agreements and HAP contracts were entered into only as mitigation efforts, at trial Ms. Glodney testified that the owners entered into the Title II Use Agreements as a direct result of the pre-payment limitation caused by ELIHPA:

Q Why did the owners enter into this use agreement [*i.e.*, that for Sherman Park, JX 23]?

A Because there was no other option. We couldn't prepay, and it was one of the options that was offered as a mechanism to offset the inability to prepay the loan.

. . .

Q Would the owners have entered into the use agreement if they had known that the prepayment right was going to be restored a year later?

A No.

T. Tr. at 97–98. *See also* T. Tr. at 100 (St. Andrews's agreement, JX 51, entered into "under the same circumstances" as Sherman Park's, JX 23). Ms. Glodney further testified that when Sherman Park and St. Andrews entered into the Title II Use Agreements, their expectation was that "the rents would go up based on the annual adjustment factor that would basically be current with what the markets were," but that, in reality, the payments that the properties received did not keep up with the market over time. T. Tr. at 98. While the court finds that Ms. Glodney's testimony was credible and that the evidence respecting under-compensating payments to the plaintiffs under their respective HAP contracts is persuasive and has not been effectively challenged by the government, the court does not find that these circumstances establish a sufficient basis for enlarging the just compensation award in this case. Rather, they provide a basis for submitting an amended or supplemental complaint in this case to raise new contractual claims based on the post-taking Use Agreements and HAP contracts, as explained below.

Plaintiffs argue that they are entitled to compensation that includes "recovery for all damages, past, present and prospective." Pls.' Post–Trial Mem. at 69 (quoting *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1359 (Fed.Cir.2003)). Plaintiffs' reliance on *Ridge Line* in this instance, however, is unavailing. In *Ridge Line*, the government's construction of a post office caused an increase in storm-water runoff over the plaintiff's property, which the Federal Circuit concluded could have resulted in an on-going taking of an easement in violation of the plaintiff's property interests. 346 F.3d at 1358–59. In remanding the case, the Court of Appeals instructed the trial court to determine the plaintiff's damages, providing the

instruction quoted by plaintiffs above and citing the Fourth Circuit's opinion in *United States v. Dickinson,* 152 F.2d 865, 867 (4th Cir.1946), *aff'd,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). *Id.* at 1359. The alleged taking at issue in *Ridge Line* was a *permanent* taking of an easement that may have resulted in incremental damages over time due to continued water run-off, similar to the on-going, permanent takings damages engendered by the government's construction of a dam in *Dickinson.* Nothing in *Ridge Line* or *Dickinson* supports the notion that the damages to which plaintiffs in those cases were entitled were not *directly* caused by the taking at issue.

Here, however, damages incurred following the originally defined takings period are not directly related to the taking that has already been found. Damages from the taking of plaintiffs' pre-payment right ceased to accrue upon termination of the taking, *i.e.,* with the signing of the Title II Use Agreements or the passage of the HOPE Act. *See Cienega VIII,* 331 F.3d at 1326–27. The "continuing" injuries that plaintiffs seek have been caused by the alleged failure by the government to fulfill its purported obligations under the Use Agreements and HAP contracts to match market rents. The relief plaintiffs seek under these contracts is thus, as a matter of law and fact, separate from the takings claims for which liability has already been established. Plaintiffs' further requests for relief amount to breach of contract claims because they are rooted in the allegation that HUD has not fulfilled its part of the bargains reflected in the newer agreements. *Cf. Economic Development & Indust. Corp. of Boston v. United States,* 13 Cl.Ct. 590, 602 (1987) (differentiating between a temporary taking giving rise to a

basis for just compensation and a subsequent breach of contract respecting the use of the same property). In *Cienega III,* the Court addressed plaintiffs' assertions that the Use Agreements and extensions of the HAP contracts were entered into under duress, holding that they were not, 38 Fed.Cl. at 78–81, and the court now finds that there is no basis to overturn that conclusion.

The court thus will not pursue at this juncture the issues related to contractual liability and damages arising from the alleged breaches of contract. To the extent that plaintiffs believe that the government has breached contractual rights under the Use Agreements and HAP contracts, they should move for leave to amend or supplement the complaint in this action to encompass their breach of contract allegations based upon such agreements.[6]

The court thus rejects plaintiffs' arguments and declines to extend the temporary takings period beyond the period considered in the 1996 trial and affirmed by the Court of Appeals. The Federal Circuit succinctly explained that "this case involves the economic effects of ELIHPA and LIHPRHA during a period of *up to eight years.*" *Cienega VIII,* 331 F.3d at 1327 (emphasis added). Plaintiffs' request improperly would in effect extend the takings period to encompass the entire life of the original mortgages after the original prepayment dates, converting the temporary taking found by the Court of Appeals into a near-permanent one. *Cf. First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 317, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) ("[T]he landowner has no right under the Just Compensation Clause to insist that a 'temporary' taking be deemed a permanent taking.").

---

**6.** This case was initially filed on January 3, 1994, prior to adoption of the Use Agreements and enactment of the HOPE Act. Leave to file an amended complaint was granted on April 1, 1996, several days after the HOPE Act was enacted. The claimed breaches all relate to occurrences or events foreshadowed by the original complaint and the amended complaint, but coming after them, and this arguably is a circumstance where "justice so requires" that "leave [to amend the complaint a second time] shall be freely given." RCFC 15(a). Among other things, such an amendment would "be necessary to

cause [the pleadings] to conform to the evidence." RCFC 15(b). Justice also requires, however, that both plaintiff and defendant have a full and fair opportunity to address the facts associated with the Use Agreements and HAP contracts in terms of a contract action rather than with a takings focus. Filing an amended pleading would both preserve plaintiffs' post-taking contractual causes of action and allow the parties to maintain and draw upon the testimony given at the May 2004 trial regarding the loss attributable to the breaches.

Because this court is limited on remand as to the relief it may provide, *i.e.*, adjustment of the reinstated damages award in light of the Federal Circuit's determination of a temporary regulatory taking, the court will not redefine the scope of the taking that plaintiffs have suffered. This issue has been resolved by the Federal Circuit, and it is not within this court's purview to alter the findings and conclusions from the 1996 trial as addressed by the Court of Appeals. Accordingly, the relevant takings periods for the four properties are as follows:

Independence Park    June 11, 1993—May 31, 1996
Pico Plaza          December 27, 1993—May 31, 1996
St. Andrews         December 19, 1991—May 26, 1995
Sherman Park        September 12, 1992—June 1, 1995

*See supra*, at 696; HOPE Act, Pub.L. No. 104–120, 110 Stat. 834 (March 28, 1996); JX 23; JX 51.

### C. Preemption and the Los Angeles Rent Stabilization Ordinance.

■ The government argues, much as it argued early in the *Cienega* cases, that a local law, the Los Angeles Rent Stabilization Ordinance ("LARSO") would have prevented plaintiffs from raising their rents to market levels even had they prepaid their mortgages and freed their properties from HUD restrictions. *See* Def.'s Post–Trial Br. Regarding LARSO ("Def.'s LARSO Br.") at 5–6.[7] Even more broadly, the government asserts that, in light of LARSO, plaintiffs would never have chosen to prepay their mortgages because it would not have been economically feasible to do so given the limit on rent increases. *Id.* at 6–7. Based upon these assertions, the government argues that "the plaintiffs are only entitled to a nominal award for the Government's taking of an opportunity the plaintiffs would not have pursued." *Id.* at 7. For their part, plaintiffs argue, as they did previously, that "LARSO

7. LARSO was initially adopted in 1979, and it was amended in 1990 to apply to rental units that previously were exempt from coverage because they were subject to federal controls. The amended ordinance provides that "[w]here a rental unit was exempt from the provisions of this chapter ... the maximum rent shall be the amount of rent last charged for the rental unit while it was exempt." Los Angeles Municipal Code § 151.02. The controversy here consequently focuses on LARSO as revised by the 1990 amendments.

is expressly preempted because LIHPRHA preempts all local laws and ordinances, such as LARSO, that interfere with the prepayment right or otherwise discriminate against formerly HUD-subsidized properties." Pls.' Post–Trial Br. Regarding LARSO ("Pls.' LARSO Br.") at 27. *See* the Supremacy Clause, U.S. Const. art. IV, § 2.

At trial, Ms. Ortega, an official with the Rent Stabilization Division, City of Los Angeles, testified as to her personal experience and knowledge obtained from working in the local office responsible for implementing LARSO. *See* T. Tr. at 999. She explained that her office treated rental properties operating under a HUD-insured mortgage as exempt from the restrictions of LARSO, but if the owner of such a property pre-paid its mortgage, it would no longer be considered exempt. T. Tr. at 1007–08. When questioned about the effect LARSO would have on such a pre-paying property, she testified that it would inhibit the property's ability to raise its rents freely:

Q  Would your office allow a HUD property to raise its rents after it prepaid its HUD mortgage?

A  We would allow them to raise their rents by the amounts allowed for the annual allowable rent increase after it had been 12 months since the last rent increase.

. . .

Q  Could they raise rents to market rate?

A  The only way they could raise it to market rate is that they were so close already to market rate [which] for many years, has been 3 percent. If it's close enough to the market rate that it's within that percentage, so, in that case, they could raise it to market rate. Otherwise, no.

LARSO contains a vacancy decontrol provision that permits owners to raise the rent for a unit to market level after the tenancy for that unit has been terminated. *Id.* § 151.06. Thus, an existing tenant of a unit at a HUD-controlled building could remain in the unit at rent-controlled rates after prepayment of the HUD mortgage, and those rates would apply until that tenant left the unit.

T. Tr. at 1009–10. She also explained that the city government does not routinely monitor the rents charged by properties within its jurisdiction but rather it investigates complaints that it receives. T. Tr. at 1012–13. Her office investigates such complaints and, when it believes that LARSO has been violated, it refers the case to the City Attorney for possible prosecution. T. Tr. at 1014. Ms. Ortega testified that she was aware of only one instance in which a property that had pre-paid its HUD-insured mortgage had been reported as improperly increasing its rent. T. Tr. at 1025. She also testified that, based upon her knowledge and understanding of the Ordinance, if a property received rent-subsidy certificates under which the rent level was set by HUD, such a rent level would be exempt from LARSO. T. Tr. at 1026.

In *Cienega III*, this court specifically addressed the issue of the effect of LARSO on plaintiffs and whether LIHPRHA[8] preempts LARSO. 38 Fed.Cl. at 81–85. Judge Robinson concluded that LARSO is preempted by LIHPRHA and, accordingly, "LARSO does not offset or bar plaintiffs' recovery of damages." *Id.* at 85. Notwithstanding the court's prior specific ruling on this issue, the government argues that the court should not treat the earlier decision on preemption as "law of the case" but rather should reopen the issue, conduct a new preemption analysis, and reverse Judge Robinson's determination. *See* Def.'s LARSO Br. at 21–30. The government also argues that the issue of LARSO's applicability is not subject to the mandate rule because the Federal Circuit did not expressly address LARSO in *Cienega VIII*. Def.'s LARSO Br. at 24–26, 30 (citing *Exxon*

*Corp. v. United States*, 931 F.2d 874, 878 (Fed.Cir.1991)).

In support of its argument that LARSO is not preempted by Title VI and that plaintiffs' damages should be reduced to nominal amounts, the government relies upon the Ninth Circuit's decision in *Topa Equities, Ltd. v. Los Angeles*, 342 F.3d 1065 (9th Cir. 2003). In *Topa*, the Ninth Circuit held that LIHPRHA did not preempt LARSO, finding that the Ordinance "is not expressly preempted by federal law, nor is it preempted on conflict grounds." *Id.* at 1067. This holding is directly contrary to Judge Robinson's conclusion in *Cienega III* that "LARSO conflicts with the Congressionally stated intent of the original prepayment scheme." 38 Fed.Cl. at 85. *See also Topa*, 342 F.3d at 1071 n. 4 (noting treatment of LARSO in *Cienega III* and subsequent failure by the Federal Circuit to address the preemption issue in *Cienega IV, Cienega VI*, and *Cienega VIII*).

The government contends that this court should be particularly mindful that *Topa* was decided by the regional circuit that encompasses the situs of the properties at issue in this case, and that deference should be accorded the decision of the regional circuit in such circumstances. However, the government's argument in this regard does not give appropriate recognition to this court's independent obligation to determine the *federal* law applicable to the issues before it. Preemption is purely a question of federal law. Accordingly, the Ninth Circuit's decision in *Topa* should be viewed as an instructive, but not binding, precedent on the preemption issue.

---

**8.** Section 4122(a) of LIHPRHA contains an express preemption clause, which provides as follows:

No State or political subdivision of a State may establish, continue in effect, or enforce any law or regulation that—

(1) restricts or inhibits prepayment of any mortgage described in section 4119(1) of this title . . . on eligible low income housing;

. . .

(3) is inconsistent with any provision of this subchapter, including any law, regulation, or other restriction that limits or impairs the ability of any owner of eligible low income housing to receive incentives authorized under this sub-

chapter (including authorization to increase rental rates, transfer the housing, obtain secondary financing, or use the proceeds of any such incentives); or

(4) in its applicability to low-income housing is limited only to eligible low-income housing for which the owner has prepaid the mortgage. . . . Any law, regulation, or restriction described under paragraph (1), (2), (3), or (4) shall be ineffective and any eligible low-income housing exempt from the law, regulation, or restriction, only to the extent that it violates the provisions of this subsection.

12 U.S.C. § 4122(a).

Equally instructive is a decision by the Eighth Circuit holding that certain Minnesota state statutes restricted or inhibited prepayment of a HUD-subsidized mortgage and thus were preempted. *Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir.2003). The court of appeals in *Forest Park II* held that the statutes at issue there were preempted both by the express provisions of LIHPRHA and by conflict preemption. 336 F.3d at 733. The Eighth Circuit in *Forest Park II* looked to the actual, practical effects of the statutes in question in interpreting the words "restrict or inhibit" in Paragraph (1) of Section 4122(a). The court noted that even though the statutes at issue "do not, on their face, directly 'restrict or inhibit' the prepayment of mortgages ... [,] to the extent that compliance with additional state regulations is required, the statutes have the direct effect of impeding, burdening, and inhibiting the prepayment of federal mortgages even if the additional requirements may be minimal." 336 F.3d at 733.

In its decision in *Topa*, the Ninth Circuit recognized that *Forest Park II* was ostensibly in conflict with its decision. The Ninth Circuit in *Topa* distinguished *Forest Park II* on the ground that the Minnesota statute at issue in *Forest Park II* "prohibit[ed] prepayment for a specified period of time even if 'an owner [had] otherwise complied with the federal notice requirements[.]'" *Topa*, 342 F.3d at 1071 (quoting *Forest Park II*, 336 F.3d at 733). However, the Ninth Circuit's distinguishing analysis ignores two salient aspects of the Eighth Circuit's decision.

First, in *Forest Park II*, the Eighth Circuit observed that, "unlike cases involving a field traditionally regulated by the states, there is no presumption against preemption in this case." *Forest Park II*, 336 F.3d at 731 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) ("[T]he relationship between a federal agency and the entity it regulated is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.")). *Topa*, by contrast, looked to whether the city's "traditionally strong interests in local rent control must yield." *Topa*, 342 F.3d at 1071 (quoting from *Kargman v. Sullivan*, 552 F.2d 2, 6 (1st Cir.1977)).[9] The Ninth Circuit additionally cited 12 U.S.C. § 4122(b), which preserves certain state or local laws,[10] and commented that "[n]othing in the HUD regulations purports to limit states from enacting their own rent control laws of general applicability which apply equally to apartment owners who exit the federal program as well as other apartment owners." *Topa*, 342 F.3d at 1072. The difficulty with the Ninth Circuit's analysis is, of course, that the applicability of LARSO does *not* apply equally—rather, the application of LARSO to properties that were in the HUD programs would lock those properties into below-market rates without first giving such properties an opportunity to establish market rates.

Second, as previously noted, the Eighth Circuit in *Forest Park II* focused on the practical effect of the state restrictions to discern whether the state statutes "restricted or inhibited" the prepayment of mortgages, commenting that the "restrict" or "inhibit" language was very broad and that Congress had originally intended to offer prepayment as an incentive to participate in the HUD

---

**9.** *Kargman* addressed whether a local rent control ordinance was preempted by HUD regulations. The First Circuit concluded that it was not preempted because the ordinance operated independently from the federal subsidized housing program. A different result was reached by the First Circuit in *City of Boston v. Harris*, 619 F.2d 87 (1st Cir.1980), in which the court of appeals held that Boston's rent control ordinance directly conflicted with HUD regulations and was accordingly preempted. Neither *Kargman* nor *City of Boston* are pertinent to the express preemption question at issue in this case.

**10.** Section 4122(b) states that Section 4122(a)—

shall not prevent the establishment, continuing in effect, or enforcement of any law or regulation of any State or political subdivision of a State not inconsistent with the provisions of this subchapter, *such as any law or regulation relating to* building standards, zoning limitations, health, safety, or habitability standards for housing, *rent control*, or conversion of rental housing to condominium or cooperative ownership, *to the extent such law or regulation is of general applicability* to both housing receiving Federal assistance and nonassisted housing.

12 U.S.C. § 4122(b) (emphasis added).

program. *Forest Park II,* 336 F.3d at 732–734. The Ninth Circuit in *Topa* implicitly rejected this approach and instead looked only to purely legal consequences—whether LARSO directly prohibited or limited the ability of a participant to prepay its mortgage by imposing some legal bar or impediment to doing so, and not addressing whether or not LARSO made it impracticable to do so as an economic matter. 342 F.3d at 1070.

In *Cienega III,* Judge Robinson analyzed the practical effects of LARSO in a way that was similar to the assessment employed by the Eighth Circuit in *Forest Park II. See Cienega III,* 38 Fed.Cl. at 84 ("[T]he analysis of LARSO's effect in the present case necessarily involves a consideration of how the [O]rdinance operates as a matter of economic reality, rather than a mere examination of its text."). Such an approach remains particularly apt in light both of the statutory language and the circumstances of this case, where the government has specifically argued that if LARSO applied to plaintiffs, it would have caused plaintiffs not to have prepaid their mortgages even if they had been permitted to do so under federal law. *See* Def.'s LARSO Br. at 6–7. In *Cienega III,* it was this very aspect of LARSO's impact that led the Court to hold that the Ordinance was preempted. 38 Fed.Cl. at 84 ("Without the cash flow from market rents, no lending institution will provide the plaintiffs with the financing necessary to prepay their mortgages. Far from accidentally, LARSO thus inhibits plaintiffs' ability to prepay their existing mortgage balances and to convert their properties to conventional."). The government further argues that this fact is unique to plaintiffs and that "[t]here is no evidence in the record that LARSO would have the same effect on other owners of properties with HUD-insured mortgages." Def.'s LARSO Br. at 7 n. 3. The court in *Forest Park II* rejected a similar argument that it would be possible for owners to find a way to comply with both the state and federal requirements, adhering to the maxim that "state statutes may not interfere with the implementation of a federal program by a federal agency."

*Forest Park II,* 336 F.3d at 732. In short, this court agrees with the reasoning and result of the Eighth Circuit in *Forest Park II* and will not follow the contrary approach taken by the Ninth Circuit in *Topa.* LARSO is expressly preempted by the operative provisions of 12 U.S.C. § 4122(a).[11]

In addition, even if one were to put the foregoing analysis aside for purposes of argument, the government's position on this issue must be rejected under the mandate rule and the law of the case doctrine. The government takes the position that because the Federal Circuit in *Cienega IV,* 194 F.3d at 1247, vacated the judgment from *Cienega III,* the determinations regarding LARSO in *Cienega III* should be given no precedential weight. *See* Def.'s Post–Trial Br. at 25. This argument, however, disregards the importance of the Federal Circuit's reinstatement of *Cienega III's* judgment. If the Court of Appeals in *Cienega VIII* had adopted the government's position on LARSO, it could not have reached the conclusions it did regarding the economic impact of ELIHPA and LIHPRHA on plaintiffs. Simply put, the government asserts that plaintiffs have suffered only nominally because LARSO would have prevented them from raising their rents, but such a conclusion is in direct opposition to the Federal Circuit's explicit and detailed assessment of significant economic impact. *Cienega VIII,* 331 F.3d at 1340–45. Thus, a ratification of the preemption finding of this court in *Cienega III* is a necessary element implied in the Federal Circuit's decision in *Cienega VIII,* bringing that finding well within the scope of the law of the case doctrine. *See Christianson,* 486 U.S. at 817, 108 S.Ct. 2166 ("That the Federal Circuit did not explicate its rationale is irrelevant, for the law of the case turns on whether a court previously decided upon a rule of law—which the Federal Circuit necessarily did—not on whether, or how well, it explained the decision." (internal quotation and alteration omitted)). This court's actions on remand must remain consistent with the

---

11. It is not necessary to reach plaintiffs' additional argument that LARSO is preempted because it conflicts with the prepayment aspect of

the original HUD program, as reinstated by the HOPE Act.

Federal Circuit's decision. *Jamesbury Corp.*, 839 F.2d at 1550.

Overall, the situation respecting LARSO is very closely akin to that in a recent case decided by the Federal Circuit where claim construction of a patent was at issue after a trial court's decision on remand. In *AFG Industries, Inc. v. Cardinal IG Co.*, 375 F.3d 1367, 1372 (Fed.Cir.2004), the Court of Appeals commented that "this court is not free to second-guess its prior decision (and even if this court were to reexamine the claim construction, it would reach a conclusion identical to the prior conclusion)."

### D. The Appropriate Damages Model

#### 1. Scope and measure of damages—lost rents.

The government has asked the court to reject the underpinnings of the reinstated damages award and to adopt the damages model presented by their expert witness, Dr. Darrell Duffie. *See* Def.'s Post–Trial Br. at 31–41; T. Tr. at 707–877; DX 1184–85. Dr. Duffie's model provides a "damage estimate [based upon] the interest that the plaintiff[s] would have received" on the "present market value, as of the beginning of the damage period, of the expected changes in cash flows" from the rental properties "until the end of the damages period, at risk-free interest rates." DX 1185 at 3–4. In other words, the government's proposed model seeks to compensate plaintiffs only for the *interest* on the foregone net rents and exclude any compensation for the foregone net rental income itself.

By contrast, plaintiffs' damages model, as presented by Dr. Richard Peiser, PX 1197, calculates damages that use as their starting point the rental payments that plaintiffs were not able to receive as a result of their inability to prepay their mortgages. The basic structure of Dr. Peiser's model formed the basis for this court's original damages judgment in *Cienega III*. 38 Fed.Cl. at 85–89. Because the original damages award in *Cienega III* was premised upon a breach of contract theory and analyzed the cash flows that the model plaintiffs would have expected to receive in the absence of ELIHPA and LIHPRHA, Dr. Peiser's model for that stage of the proceedings has been characterized as

a "lost profits" model. *See id.* at 73–74; *Cienega VIII*, 331 F.3d at 1341.

The government supports its argument primarily by reference to the Federal Circuit's opinion in *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1581 (Fed.Cir.1990) ("*Yuba V*"), in which the Federal Circuit explained that "[t]he usual measure of just compensation for a temporary taking ... is the fair rental value of the property for the period of the taking." In *Yuba*, the property that was taken encompassed the mineral rights in a certain tract of land, primarily the right to extract and sell gold. 904 F.2d at 1578. For a period of just under six years, the *Yuba* plaintiff was prohibited from mining on its land, and the Federal Circuit determined that such restriction amounted to a temporary taking. *Id.* at 1579–80. The plaintiff there was entitled to "the fair rental value of the property for the period of the taking," which the court determined based upon the minimum amount of rent and royalties that the plaintiff would have received under a lease and joint venture agreement it had negotiated shortly before the taking commenced. *Id.* at 1581.

In reaching this conclusion, the Federal Circuit explained that "[i]n the case of a temporary taking, ... since the property is returned to the owner when the taking ends, the just compensation to which the owner is entitled is the value of the use of the property during the temporary taking, *i.e., the amount which the owner lost as a result of the taking.*" *Id.* at 1580–81 (emphasis added) (citing *First English*, 482 U.S. at 319, 107 S.Ct. 2378). Importantly, at the end of the taking period in *Yuba*, the plaintiff regained all the gold it had initially possessed and was free to do with the gold as it liked. Thus, the benefits adhering to the property were simply delayed by the taking without disrupting or altering an on-going business, and the just compensation award paid for that delay. *See id.* at 1582 ("[T]here was no existing business or going concern that the government took."). In all events, *Yuba* does not provide direct support for the government's proposition that only the *interest* on net rents should be the measure of damages for a temporary taking.

Perhaps even more to the government's point, however, is *Bass Enterprises Prod. Co. v. United States*, 48 Fed.Cl. 621, 624–25 (2001) ("*Bass IV*"), in which this court awarded a plaintiff who had suffered a temporary taking the "difference in *interest* on the cash flows" that the plaintiff would have received if it had been permitted to extract its oil and gas during the period of the temporary taking. (Emphasis added.) Analogously to the plaintiff in *Yuba*, "Bass ha[d] not lost any of the oil and gas. Bass ha[d] lost time." 48 Fed.Cl. at 624. Unlike the plaintiffs in those instances, however, when the takings in this case ended, the plaintiffs here could not simply recapture the property that had been foregone during the takings period and regain their position, losing only time in the process. Rather, the income-generating opportunity the property provided had been entirely lost during the period of the temporary taking, not just postponed.[12]

■ "The proper measure of just compensation is that which will put the owner 'in as good a position pecuniarily as he would have occupied if his property had not been taken.'" *Bass Enterprises Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed.Cir. 1998) ("*Bass II*") (quoting *Yuba Natural Res., Inc. v. United States*, 821 F.2d 638, 640 (Fed.Cir.1987) ("*Yuba IV*"); *United States v. Miller*, 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336 (1943)). Stated another way, the appropriate measure of the plaintiffs' loss is what a hypothetical buyer in a hypothetical free market for the property that was taken would have paid for that property. *See Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984); *United States v. General Motors*, 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945). In the context of a temporary taking,

the appropriate measure of compensation is typically deemed to be the rental value of the property taken over the period of time for which it was taken. *Yuba V*, 904 F.2d at 1581. *See also First English*, 482 U.S. at 322, 107 S.Ct. 2378; *Kimball Laundry Co. v. United States*, 338 U.S. 1, 6–7, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). When the property taken is of a type for which there is not an easily identifiable market or determination of a fair market value cannot be readily made, courts may look to other available sources to determine what measure of compensation would most accurately compensate the plaintiff. *See Kimball Laundry*, 338 U.S. at 6, 69 S.Ct. 1434 ("[W]hen the property is of a kind seldom exchanged, it has no 'market price,' and then recourse must be had to other means of ascertaining value."). *See also Yuba V*, 904 F.2d at 1581 ("total minimum amount of rent and royalties" that plaintiff would have received under a proposed joint venture agreement).

■ In this case, when the government took the plaintiffs' ability to free themselves from HUD's restrictions on the use of their property, the government effectively deprived them of the opportunity to increase their profit by increasing rents to market rates. It would be unreasonable to expect that someone looking to purchase or rent the right to increase rents would fail to include in his or her valuation of that right the actual increased level of rents to be gained. Neither would the offeror neglect to consider the cash flow in making calculations aimed at determining a fair offering price. Thus, any market price that one may attempt to estimate in determining the just compensation for plaintiffs' loss must take the plaintiffs' foregone rent increases into account. Only the damages presented by plaintiffs' expert, Dr. Peiser, seek to include such amounts.[13]

---

**12.** During the retrial, two different analogies were presented to illustrate the different circumstances in *Yuba* and *Bass* in contrast to this case. In simplistic terms, *Yuba* and *Bass* are signified by a gold bar which was taken for a period of time and then returned intact. *Bass* would indicate that the just compensation for the taking of the gold bar should be interest on the value of the bar for the time of the taking. T. Tr. at 734, 832 (testimony by Dr. Duffie). However, this case is more akin to a second exemplar in which

a beach house that ordinarily was rented for income was taken for a period of years and then returned. The taking in this latter instance would involve the loss of the rental income stream for the period, expressed as a present value at the end of the temporary taking period. T. Tr. 867–71 (testimony by Dr. Duffie).

**13.** The government's damages expert, Dr. Duffie, conceded at trial that a property owner who suffered a temporary taking of his or her rental

The government's model expressly excludes such amounts, using the anticipated cash flow from such foregone rental increases but then basing the final damages calculation on only a small "interest" fraction of that cash flow. For this reason, the model presented by Dr. Duffie must be rejected as a matter of law for its failure to approximate just compensation for the plaintiffs. Likewise, the court rejects the government's objections to the "lost profits" aspects of Dr. Peiser's model. In this instance, the plaintiffs' foregone rent increases are the best available indicator for determining just compensation, and award of such is appropriate. *See Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1188–89 (Fed.Cir.2004) ("where ... the issue concerns the economic impact, albeit temporary, of government regulations on a going business concern[,]" a returns-based analysis may be more suitable than one based on diminution in value). *See also Kimball Laundry*, 338 U.S. at 15, 69 S.Ct. 1434 ("[W]hen the Government has taken the temporary use of [a going concern], it would be unfair to deny compensation for a demonstrable loss of going-concern value."); *Yuba IV*, 821 F.2d at 641 (quoting *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 903 (Fed.Cir. 1986) ("*Florida Rock II* ")); *United States v. Right to Use & Occupy 3.38 Acres of Land*, 484 F.2d 1140, 1144 (4th Cir.1973) (finding that where the government condemned a short-term leasehold in premises that were the subject of a larger private loss, the correct standard for determining just compensation was the annual rental value measured as though the premises were rented in the open market).

### 2. Dr. Peiser's model.

As noted *supra*, at 701, the court rejects the portions of Dr. Peiser's model that seek compensation for damages incurred after the original takings period. Accordingly, the court addresses here only those portions of his model that relate to providing an appropriate adjustment to the original damages award. The court otherwise agrees with

Judge Robinson's determination in *Cienega III* that Dr. Peiser's calculations are in large part reasonable, comprehensive, and reliable. 38 Fed.Cl. at 85–86. In response to criticisms of his model by the government's experts, Dr. Peiser made corrections in his new model to reflect more accurately the plaintiffs' circumstances.[14] With the corrections, Dr. Peiser's model provides a satisfactory, persuasive basis for damages in this case.

### 3. Discounting.

The first step in determining the appropriate value of plaintiffs' damages requires adjusting the original damages award to an appropriate basis for just compensation through the use of discounting. "[T]he valuation of property which has been taken must be calculated as of the time of the taking." *First English*, 482 U.S. at 320, 107 S.Ct. 2378. In this instance, Judge Robinson's decision in 1997 provided a cash-flow based valuation of the property taken in nominal 1996 terms. To determine the value of the property for just compensation purposes, it is necessary to apply a discount rate to the stream of net rental income to determine the present value at the time of the taking. *See Whitney Benefits, Inc. v. United States*, 18 Cl.Ct. 394, 408–16 (1989), *aff'd*, 926 F.2d 1169, 1177–78 (Fed.Cir.1991). *Cf. Energy Capital Corp. v. United States*, 302 F.3d 1314, 1330–31 (Fed.Cir.2002).

At the 1996 trial plaintiffs requested, as reflected in Dr. Peiser's original expert report, non-discounted damages in the amount of $3,420,864, which was the sum of $776,697 for Independence Park, $156,437 for Pico Plaza, $1,576,836 for St. Andrews, and $910,894 for Sherman Park. *Cienega III*, 38 Fed.Cl. at 71; PX 200 at ¶ 15. The court reduced the requested amount by $359,757, which it determined were disallowed appraisal and legal costs. *Cienega III*, 38 Fed.Cl. at 89 n. 19. This reduction was the sum of the following reductions for the individual properties: $62,669 from Independence Park,

---

property would be entitled to receive rents that he or she had been forced to forego during the takings period in order to be made whole. T. Tr. at 867–71.

**14.** Among other things, the changes related to prepayment of the HELP loans, T. Tr. at 417–18, and prepayment penalties incurred upon early payment of mortgages. T. Tr. 407–09.

$141,130 from St. Andrews, $128,836 from Sherman Park, and $27,122 from Pico Plaza. *Id.* at 87 n. 17. Thus, the final award from *Cienega III* was $3,061,107, determined on an individual property-by-property basis as follows: $714,028 for Independence Park, $129,315 for Pico Plaza, $1,435,706 for St. Andrews, and $782,058 for Sherman Park. In his model presented to the court for the 1996 trial, Dr. Peiser provided an alternate calculation of damages that applied a discount rate of ten percent to determine the value of the plaintiffs' damages in terms of 1996 dollars. PX 200 at ¶ 17. This "present value version" assigned a total damages value of $4,569,447 as of October 31, 1996, rather than limiting its discounting calculations to the actual period of the takings. Also, this value included appraisal and legal costs that were subsequently disallowed in *Cienega III. Id.* at ¶¶ 14, 17. In his amended model presented in this phase of the proceedings, Dr. Peiser began his calculations based upon the nominal damages award from *Cienega III.* PX 1154 at ¶ 19.[15] He then "brought those damages forward to March 31, 2004," by calculating pre-judgment interest with four different interest rates, one of which was eleven percent, his recommended value for interest. PX 1197 Exs. 3, 3(a)-(d); T. Tr. at 225–26. However, Dr. Peiser neglected to calculate a present value for the damages to account for the time between the beginning and the end of the respective takings periods. *Cf. American Pelagic Fishing Co. v. United States,* 379 F.3d 1363, 1371 n. 11, 2004 WL 1812709, *5 n. 11 (Fed.Cir.2004) ("The essential element of a temporary taking is a finite start and end to the taking.") (quoting *Wyatt v. United States,* 271 F.3d 1090, 1097 n. 6 (Fed.Cir. 2001)).

The court's award in *Cienega III,* which was founded upon a non-discounted, nominal figure, did not accurately compensate plaintiffs for their taking because it did not reflect a present value for plaintiffs' property at the end of the temporary taking, and would not have placed plaintiffs in as good a position pecuniarily as they would have been absent the passage of ELIHPA and LIHPRHA. For a permanent taking, the valuation date would be the date of the taking itself. *See Kirby Forest Indus.,* 467 U.S. at 11, 104 S.Ct. 2187 ("[I]dentification of the time a taking of a tract of land occurs is crucial to determination of the amount of compensation to which the owner is constitutionally entitled."). For a temporary taking, a discrete period of time is involved, with a definite starting date and an ending date. *See American Pelagic,* 379 F.3d at 1371 n. 11, 2004 WL 1812709, *5 n. 11 (quoted *supra* ).

*(a). The valuation date for a temporary taking.*

In an analysis of valuation for a temporary taking, the valuation date should be the *end* of the temporary takings period, not the beginning or some intermediate date. The end of the temporary taking establishes the date when the statute of limitations begins to run on the takings claim. *See Creppel v. United States,* 41 F.3d 627, 632 (Fed. Cir.1994). In addition, all events during the temporary takings period may have to be taken into account in setting a valuation. *See Bass II,* 133 F.3d at 895–96; *Creppel,* 41 F.3d at 632.[16] This is not to say that a definite end of a temporary taking is a necessary prerequisite for an award of just compensation. *Bass* is illustrative of a situation where a taking known to be temporary had not yet come to a cessation point.[17] In *Bass*

---

**15.** At trial, Dr. Peiser described two "changes" that he made to the base values upon which he made his calculations for the original damages period. T. Tr. at 217–18. However, the results of those "changes" produced similar values to those that the Court awarded in *Cienega III. See* PX 1197 Exs. 3, 3(a)-(d).

**16.** At the retrial, the government argued strenuously that events occurring after the *beginning* of the temporary takings period were "ex post" and should be disregarded in addressing damages. *See, e.g.,* T. Tr. at 367–371 (cross-examination of

Dr. Peiser); T. Tr. at 48–49, 55–60, 84–89 (closing argument on June 30, 2004). The court rejects this position because the events during the temporary takings period are relevant not just to delineate the period itself but also to provide an objective, non-speculative basis for assessing value, as *Bass II* and *Creppel* suggest.

**17.** Bringing suit for a temporary taking before that taking has ended has some similarity to a suit for anticipatory breach of contract. As the Supreme Court noted in *Franconia Assocs. v. United States,* 536 U.S. 129, 122 S.Ct. 1993, 153

*II*, the Federal Circuit observed that "[t]he fact that regulation has not ceased may complicate a determination of just compensation but does not justify a bright-line rule against liability." *Bass II*, 133 F.3d at 896 (citing *Hendler v. United States*, 952 F.2d 1364, 1375 (Fed.Cir.1991), and *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1583 (Fed.Cir.1993)). The method of calculation for that complicated situation is generally set out in *Energy Capital*, even though the discussion there addresses damages in the form of lost profits for breach of contract. In *Energy Capital*, the Federal Circuit indicated that "the damages that would have arisen after the date of judgment ('future lost profits') must be discounted to the date of judgment." 302 F.3d at 1330. If the end date and future damages are not susceptible of reasonable estimation, alternatively damages might be awarded through the end of the year or fiscal year immediately preceding trial, with that end date as the valuation date, with future damages preserved, and provision made for a future proceeding in accord with *Restatement (Second) Of Judgments* § 26(1). *See Tennessee Valley Auth. v. United States*, 60 Fed.Cl. 665, 677 (2004). In all events, the valuation date, and thus the focus for discounting cash flows to obtain a present value, for a temporary taking should reflect the *end* of the relevant period, wherever possible. Discounting damages incurred prior to the end of the temporary taking period would thus produce an *increase*, not a decrease, in those damages for the early years. That is, the early-years damages in such a situation would be worth more in present-value terms than the damages incurred in the year the taking ends.

### (b). The discount rate.

Determination of an appropriate discount rate is also a key element of a calculation of present value. The government's expert, Dr. Duffie, conducted two discounting analyses as part of his expert report, discounting the plaintiffs' cash-flows, after certain adjustments, for the takings period under two different scenarios, one using a ten percent discount rate and the other reflecting a fifteen percent discount rate. *See* DX 1255 at 10. Dr. Duffie opined that a ten percent discount rate was appropriate for the "less risky actual world" in which plaintiffs did not prepay their mortgages, while a fifteen percent rate for some purposes was appropriate for the "but-for" world where a prepayment would have occurred. *Id.* At trial, Dr. Duffie acknowledged that the use of these divergent discount rates for analyzing the two scenarios, particularly use of the higher discount rate of fifteen percent, worked to bias the government's calculation against plaintiffs. T. Tr. at 808–09.[18] In addition, the government's use for some purposes of a ten percent rate exactly mirrors Dr. Peiser's use of that rate in his original report. In all the circumstances, the court finds that a ten percent discount rate is appropriate for determining the value of plaintiffs' just compensation damages during the temporary takings period. The properties involved in this case involved only moderate risks. They had lengthy histories of successful tenant occupancy, were consistently well maintained, and were well located for tenant occupancy. In this respect, the court reaffirms the earlier findings in *Cienega III* that "[e]ach of these properties had great potential for refinancing well above the amount owed," 38 Fed.Cl. at 76, and that the properties "are all located in middle class neighborhoods and, in general, are equal to or surpass the quality of neighboring properties in the area." *Id.* at 75.[19] The court accordingly rejects Dr.

L.Ed.2d 132 (2002), a party injured by a repudiation of a contract has an option: that party may elect to place the repudiator in breach before the performance date and sue on the accelerated cause of action, or the party may wait until performance is due, and the statute of limitations commences to run, before bringing suit. *Id.* at 144, 122 S.Ct. 1993 (quoting 1 Calvin W. Corman, *Limitation of Actions* § 7.2.1, at 488–89 (1991)).

18. Actually, in the reverse-discounting situation at hand in this case, use of Dr. Duffie's higher discount rate for the temporary taking period would *benefit* plaintiffs.

19. The findings were accorded weight by the Court of Appeals in *Cienega VIII*. *See* 331 F.3d at 1347. The one property of the four that was not necessarily well located, Pico Plaza, was the subject of detailed testimony by Dr. Peiser, plaintiffs' expert, who had lived nearby while teaching at

Hamm's testimony that a higher discount rate should be used because the properties had not been operated in the unrestricted market and thus did not ,have financially strong tenants. T. Tr. at 636. There is no evidence that plaintiffs' properties presented uncertain or speculative prospects or gave rise to abnormal risks. A relatively standard discount rate of ten percent thus is appropriate.

### E. Plaintiffs' Adjusted Damages

Given the court's findings in the preceding sections, neither the government's experts nor the plaintiffs' expert appropriately calculated the value of plaintiffs' property on a discounted cash-flow basis for the takings period. Thus, the court has undertaken its own discounting calculations to determine the appropriate valuation of plaintiffs' damages as of the end-dates of their respective takings periods. *See generally United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 379 (4th Cir.1995) (noting that a finder of fact

is "in no way obligated to accept either of the part[ies'] theories on the appropriate rate of discounting" and affirming calculations made independently of the parties' presentations). Dr. Peiser computed plaintiffs' damages on an annual basis. PX 201–204; PX 1197 Exs. 3(a)-(d). The court utilized his annual figures to determine and apply the appropriate discount factors, based upon an annual discount rate of ten percent. The court's calculations are set forth in tables set out below, for each property involved in this case.[20] As a result of its calculations, the Court finds that the plaintiffs are entitled to an adjustment of the original damages award, such that plaintiffs are due the following amounts expressed in terms of present value at the end of the temporary takings period for each property: Independence Park: $788,028.94, Pico Plaza: $138,761.63, St. Andrews: $1,638,201.20, and Sherman Park: $859,049.22.

the University of Southern California. T. Tr. at 187–88, 208–09, 386–87.

**20.** Because the annual values for damages antedated the valuation date, the present-value calculation using a discount rate works in reverse to increase the values for the earlier years to determine present value as of the valuation date.

**Independence Park**

| Date of determination of annual accrued damages | Annual amount of damages | Time period between valuation amount for a given year and the takings valuation date* | discount factors (years; months)** | product of discount factors | Value as of May 31, 1996 (product of annual value and discount factors) |
|---|---|---|---|---|---|
| 6/30/93 | $11,432 | 2 years; 11 months | 1.210; 1.0912978374 | 1.3204703833 | $15,095.62 |
| 6/30/94 | $243,149 | 1 year; 11 months | 1.100; 1.0912978374 | 1.2004276211 | $291,882.78 |
| 6/30/95 | $236,638 | 0 years; 11 months | n/a; 1.0912978374 | 1.0912978374 | $258,242.54 |
| 5/31/96 | $222,808 | zero | n/a | n/a | $222,808.00 |
| Total | $714,027 | | | | **$788,028.94** |

*Arguably, the annual amounts ought to be taken as representing the mid-point of the pertinent year for discounting purposes. However, the parties did not argue this point nor did they present any evidence or testimony related to it. Accordingly, the Court has treated all of the annual amounts as representing year-end figures.

**Discount factors are derived from *Financial Compound Interest and Annuity Tables* 730, 779, 825-27 (Charles H. Gushee, ed. 4th ed., 1972). *See id.* at 730 (whole year factors), 779 (monthly & daily factors), 825-27 (methodology for determining factors for months and days). The discount factor for a period of eight months is determined by raising the factor for one month to the eighth power, *i.e.,*

$$(1.0079741404)^8 = 1.065602237$$

**Pico Plaza**

| Date of determination of annual accrued damages | Annual amount of damages | Time period between valuation amount for a given year and the takings valuation date | discount factors (years; months) | product of discount factors | Value as of May 31, 1996 (product of annual value and discount factors) |
|---|---|---|---|---|---|
| 12/31/93 | $476 | 2 years; 5 months | 1.210; 1.040511662 | 1.259019111 | $599.29 |
| 12/31/94 | $49,097 | 1 year; 5 months | 1.100; 1.040511662 | 1.144562828 | $56,194.60 |
| 12/31/95 | $54,916 | 0 years; 5 months | n/a; 1.040511662 | 1.040511662 | $57,140.74 |
| 5/31/96 | $24,827 | zero | n/a | n/a | $24,827.00 |
| Total | $129,315 | | | | $138,761.63 |

**Sherman Park**

| Date of determination of annual accrued damages | Annual amount of damages | Time period between valuation amount for a given year and the takings valuation date | discount factors (years; months) | product of discount factors | Value as of May 31, 1995 (product of annual value and discount factors) |
|---|---|---|---|---|---|
| 9/30/92 | $16,052 | 2 years, 8 months | 1.210; 1.065602237 | 1.2893787068 | $20,697.11 |
| 9/30/93 | $348,589 | 1 year, 8 months | 1.100; 1.065602237 | 1.1721624607 | $408,602.94 |
| 9/30/94 | $187,984 | 0 years; 8 months | n/a; 1.065602237 | 1.065602237 | $200,316.17 |
| 5/31/95 | $229,433 | zero | n/a | n/a | $229,433.00 |
| Total | $782,058 | | | | **$859,049.22** |

**St. Andrews**

| Date of determination of annual accrued damages | Annual amount of damages | Time period between valuation amount for a given year and the takings valuation date | discount factors (years; months; days) | product of discount factors | Value as of May 25, 1995 (product of annual amount and discount factors) |
|---|---|---|---|---|---|
| 12/31/91 | $12,028 | 3 years; 5 months; 25 days | 1.331; 1.040511662; 1.006549450 | 1.3939914931 | $16,766.93 |
| 12/31/92 | $416,747 | 2 years; 5 months; 25 days | 1.210; 1.040511662; 1.006549450 | 1.2672649937 | $528,128.88 |
| 12/31/93 | $443,755 | 1 year; 5 months; 25 days | 1.100; 1.040511662; 1.006549450 | 1.1520590852 | $511,231.98 |
| 12/31/94 | $399,257 | 0 years; 5 months; 25 days | n/a; 1.040511662; 1.006549450 | 1.0473264411 | $418,152.41 |
| 5/25/95 | $163,921 | zero | n/a | n/a | $163,921.00 |
| Total | $1,435,707 | | | | $1,638,201.20 |

### F. *Interest*

The court has been directed on remand to determine whether pre-judgment interest is due to plaintiffs and, if so, at what rate. "If the Government pays the owner before or at the time the property is taken, no interest is due on the award[,] ... [b]ut if disbursement of the award is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a

position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus.*, 467 U.S. at 10, 104 S.Ct. 2187. This basic precept "arises in a taking under the Fifth Amendment. To satisfy the constitutional mandate, 'just compensation' includes a payment for interest." *Library of Congress v. Shaw*, 478 U.S. 310, 317 n. 5, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). *See Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664 (1923) ("[T]he owner is not limited to the value of the property at the time of the taking; he is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking. Interest at a proper rate is a good measure by which to ascertain the amount so to be added."). Thus, an award of interest ordinarily is an essential element of a just-compensation award, not some adjunct to it.

### 1. Objections to provision for interest.

Despite the line of cases that includes *Kirby Forest Industries* and *Seaboard Air Line*, the government challenges plaintiffs' right to interest, citing Dr. Peiser's "decision not to incorporate the time value of money in his original nominal model" and suggesting that plaintiffs have foregone any right to interest. Def.'s Post–Trial Br. at 62–63. As the court has already explained, *supra*, at 708–09, Dr. Peiser *did* provide a version of his model in the original trial that took the time value of money and interest into account. *See* PX 200 at ¶ 17. In *Cienega III,* the court selected the nominal version of his model as the appropriate measure of damages for breach of contract rather than the discounted version. And, as previously noted, Dr. Peiser's model presented at retrial reflected both a discount rate and an allowance for interest. Plaintiffs thus have not waived their right to interest.

The government also repeats its contention that plaintiffs' damages model is based upon "lost profits" and therefore does not serve as an adequate basis for awarding interest. *See*

Def.'s Post–Trial Br. at 61–62. The government asserts that any award made under the damages theory previously adopted by this court "would have made the plaintiffs whole" and therefore would not necessitate interest. *Id.* at 62. This argument by the government also is unavailing and misstates the role of interest in an award of just compensation. In this case, nearly a decade has passed since the takings periods ended. The government has presented no supportable argument why interest is inappropriate. Had the takings not occurred and had plaintiffs simply realized the value of their taken property in the normal course of events absent ELIHPA and LIHPRHA, plaintiffs would have had the opportunity to earn income and then to invest that earned income to generate a further return. Denying them interest would fall well short of placing them "in as good a position pecuniarily" as they would have been without the taking. *Kirby Forest Indus.*, 467 U.S. at 10, 104 S.Ct. 2187. In sum, interest should be awarded in this case.

### 2. An appropriate interest rate.

■ "[N]o consensus has emerged with regard to the appropriate interest rate to be employed in just compensation cases." *Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed.Cl. 624, 627, 2004 WL 1870073, *1 (Aug. 18, 2004). Recognizing as much, the parties have provided the court with a number of alternative interest rates from which to choose. The court finds that the method for calculating pre-judgment interest based upon Treasury STRIPS[21] presented by a government-proffered expert, Dr. Hamm, T. Tr. at 920–22; DX 1254 at 20–21, is a useful starting point. However, he proposed using one-year Treasury STRIPS, T. Tr. at 921, and that security would not accord with the lengthy delay in this case. A ten-year Treasury STRIP rate would be more appropriate.

The ten-year Treasury STRIP rate would provide reasonable approximation of the rate that a "prudent investor" might have obtained, *Tulare Lake*, 61 Fed.Cl. at 627, 2004

---

**21.** STRIPS is an acronym for "Separate Trading of Registered Interest and Principal of Securities." *See* U.S. Dep't of the Treasury, *Treasury* *STRIPS,* at http://www.publicdebt. treas.gov/of/ofstrips.htm (last modified Feb. 22, 2004).

WL 1870073, *2, taking into account the lengthy delay and risks frequently associated with enforcing a takings judgment against the federal government while still providing a reasonable return on investment over time. The prudent-investor rule does not turn on how a particular plaintiff would have invested a recovery. Rather, it seeks to assure "how 'a reasonably prudent person' would have invested the funds to 'produce a reasonable return while maintaining safety of principal.'" *Id.* (quoting *United States v. 429.59 Acres of Land,* 612 F.2d 459, 464–65 (9th Cir.1980)). As a consequence, the prudent-investor rule does not require that a reference be made only to a rate of interest on Treasury securities where the United States is the defendant, as the government claims. In this respect, *Georgia–Pacific Corp. v. United States,* 226 Ct.Cl. 95, 640 F.2d 328 (1980), is particularly instructive. The Court of Claims there selected an interest rate based on Moody's Composite Index of Yields on Long Term Corporate Bonds, relying on factors specific to the case and a policy of providing uniformity of treatment to similarly situated litigants whenever possible. *Id.,* 640 F.2d at 365–66. The court here has applied the mode of analysis in *Georgia–Pacific* to select an interest rate on a security that approximately matches the duration involved in this case, that is widely held, that provides safety of principal, and for which interest-rate data are readily available.

The court cannot directly draw upon Dr. Hamm's interest calculations because they used a Treasury STRIP with a different maturity and covered a period from the *beginnings* of the temporary takings until 2003. T. Tr. at 922. The court finds that plaintiffs are entitled to interest on their award for the period from the *ends* of the temporary takings periods until they receive payment pursuant to the court's judgment. In calculating the present value of the damages component of the award, the court has already provided for plaintiffs' damages during the temporary takings period. *See supra,* at 711. Also, it remains uncertain when the court's judgment will be ultimately paid. Accordingly, plaintiffs are entitled to interest on the damages component of the award from the ends of their respective takings periods until payment is received, calculated using annual averages of the daily yields of ten-year Treasury STRIPS.

### 3. Compound or simple interest.

If interest is awarded, the government urges that only simple interest be allowed. T. Tr. at 168 (June 30, 2004). Plaintiffs seek compound interest. T. Tr. at 101–02. The question thus before the court is whether compound interest is necessary to put plaintiffs "in as good a position pecuniarily as [they] would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus.,* 467 U.S. at 10, 104 S.Ct. 2187.

As the Federal Circuit has noted, compound interest may be necessary "to accomplish complete justice" under the just compensation clause. *Dynamics Corp. of Am. v. United States,* 766 F.2d 518, 520 (Fed.Cir. 1985). Among the considerations that bear on this question, those most significant for this case seem to be the time lag between the taking and the compensation and the use to which the plaintiffs might have put the award.

The timing factor weighs strongly in favor of compound interest. This case is over ten years old, and the takings began well before the case was brought. Plaintiffs thus have been deprived of their property for a considerable period of time, and there is no assurance that the court's judgment, ordered today, will be the end of the matter. The usage factor similarly supports an award of compound interest. As plaintiffs noted, they "have an ongoing business, and their business is driven by equity." T. Tr. at 101 (June 30, 2004). In this regard, the government's expert, Dr. Duffie, applied compound interest on an economic basis: "I'm not aware of whether compound interest or simple interest is the appropriate method of legal assignment of damages, but as a matter of economics it's normal for me to compound and that's what I did in this case." T. Tr. at 814.

Based upon these considerations, an award of compound interest is appropriate in this case. *See American Nat'l Fire Ins. Co. ex*

rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys. Inc., 325 F.3d 924, 938 (7th Cir.2003) (citing *Dynamics Corp.*, 766 F.2d at 520).

## CONCLUSION

For the reasons set forth above, the Court determines that plaintiffs are entitled to judgment as follows: Independence Park is entitled to $788,028.94, Pico Plaza is entitled to $138,761.63, St. Andrews is entitled to $1,638,201.20, and Sherman Park is entitled to $859,049.22. Each plaintiff is also entitled to interest on their respective awards, calculated from the following dates until payment is made by the government: Independence Park—June 1, 1996, Pico Plaza—June 1, 1996, St. Andrews—May 26, 1995, and Sherman Park—June 1, 1995. Such interest shall be calculated based upon the annual average of the daily yield rate on ten-year Treasury STRIPS and shall be compounded annually. The Clerk of the Court shall enter a final judgment accordingly.

Plaintiffs are accorded a period of thirty days from entry of this opinion and order to file an amended complaint to state claims of breach of contract arising under the Use Agreement and HAP contracts. *See supra* at 701 & n. 6. Because these contract claims have an independent, albeit related, basis from the takings claims addressed in this remanded proceeding, the court directs the clerk to enter final judgment pursuant to RCFC 54(b) as to the takings claims based on this opinion and order. There is no just reason for delay in entering final judgment on the takings claims in this proceeding, especially given the circumstance that the case is over ten years old and has been the subject of extensive prior proceedings.

Costs shall be allowed to plaintiffs. In accord with RCFC 54(d), plaintiffs shall file a bill of costs within 30 days after the date of final judgment.[22] Plaintiffs shall include with their bill of costs any petition they may make for an award of attorneys' fees and expenses. *See* Section 304(c) of the Uniform Relocation Assistance and Real Property Acquisition

Policies Act of 1970, 42 U.S.C. § 4654(c). *Compare Pete v. United States,* 215 Ct.Cl. 377, 569 F.2d 565 (1978) (personal property can be the basis of a claim under Section 4654(c)), *and Drakes Bay Land Co. v. United States,* 198 Ct.Cl. 506, 459 F.2d 504 (1972) (allowing a claim under Section 4654(c) where government denied liability and plaintiff was forced to bring an inverse condemnation suit that was ultimately successful), *with Rocca v. United States,* 205 Ct.Cl. 275, 500 F.2d 492, 496 (1974) (acknowledging the validity of *Drakes Bay* and distinguishing that decision from a situation in which an act of Congress "was equivalent to and the same as a taking by condemnation."). *See also* 28 U.S.C. § 2412(d); *Essex Electro Eng'rs v. United States,* 757 F.2d 247 (Fed.Cir.1985); *United States v. 640.00 Acres of Land in the County of Dade,* 756 F.2d 842, 846 (11th Cir.1985).

It is so ORDERED.

---

**22.** As RCFC 58(c) provides, entry of judgment shall not be delayed in order to tax costs or